# IN THE SUPREME COURT OF TENNESSEE
## AT JACKSON
May 31, 2012 Session Heard at Lipscomb University[1]

## DAVID KEEN v. STATE OF TENNESSEE

**Appeal by Permission from the Court of Criminal Appeals**
**Criminal Court for Shelby County**
**No. P25157      Chris Craft, Judge**

---

**No. W2011-00789-SC-R11-PD - Filed December 20, 2012**

---

This appeal involves a prisoner who was sentenced to death in 1991. Nineteen years later, he filed a petition in the Criminal Court for Shelby County seeking to reopen his post-conviction proceeding on the ground that he possessed new scientific evidence of his actual innocence. His evidence consisted of a newly-obtained I.Q. test score purportedly showing that he could not be executed by virtue of Tenn. Code Ann. § 39-13-203 (2010) because he was intellectually disabled. The trial court declined to hold a hearing and denied the prisoner's petition. The trial court determined, as a matter of the law, that the prisoner's newly-obtained I.Q. test score was not new scientific evidence of his actual innocence of the offenses to which he earlier pleaded guilty. The prisoner filed an application for permission to appeal the denial of his petition to reopen in the Court of Criminal Appeals. In addition to asserting that the newly-obtained I.Q. test score was new scientific evidence of his actual innocence, the prisoner asserted that this Court's decision in *Coleman v. State*, 341 S.W.3d 221 (Tenn. 2011), announced a new constitutional right and, therefore, provided another basis for reopening his petition for post-conviction relief. The Court of Criminal Appeals entered an order on June 29, 2011, affirming the trial court's denial of the petition to reopen because the I.Q. test score did not amount to scientific evidence of actual innocence for the purpose of Tenn. Code Ann. § 40-30-117(a)(2) (2006) and because *Coleman v. State* did not announce a new rule of constitutional law under Tenn. Code Ann. § 40-30-117(a)(1). We granted the prisoner's application for permission to appeal to address whether the phrase "actually innocent of the offense" in Tenn. Code Ann. § 40-30-117(a)(2) encompasses ineligibility for the death penalty in addition to actual innocence of the underlying crime and whether our holding in *Coleman v. State* established a new constitutional right to be applied retroactively under Tenn. Code Ann. § 40-30-117(a)(1). We hold that the Tennessee General Assembly, when it enacted Tenn. Code Ann. § 40-30-117(a)(2), did not intend for the phrase

---

[1]Oral argument was presented on the campus of Lipscomb University in Nashville, Davidson County, Tennessee, as a part of the Girls State Supreme Court Advancing Legal Education for Students (S.C.A.L.E.S.) project.

"actually innocent of the offense" to include ineligibility for the death penalty because of intellectual disability. We also hold that *Coleman v. State* did not establish a new rule of constitutional law that must be applied retroactively under Tenn. Code Ann. § 40-30-117(a)(1). Accordingly, we affirm the judgment of the trial court and the Court of Criminal Appeals denying the prisoner's petition to reopen his post-conviction petition.

### Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Criminal Appeals Affirmed

WILLIAM C. KOCH, JR., J., delivered the opinion of the Court, in which JANICE M. HOLDER, CORNELIA A. CLARK, and SHARON G. LEE, JJ., joined. GARY R. WADE, C.J., filed a dissenting opinion.

Kelley Henry and Gretchen L. Swift, Office of the Federal Public Defender, Nashville, Tennessee, for the appellant, David Keen.

Robert E. Cooper, Jr., Attorney General and Reporter; William E. Young, Solicitor General; Deshea Dulany Faughn, Assistant Attorney General, Nashville, Tennessee, for the appellee, State of Tennessee.

### OPINION

### I.

Eight-year-old Ashley Nicole Reed was raped and murdered in March 1990. Her body, wrapped in a blanket, was thrown into the Wolf River near Mud Island in Memphis. Shortly thereafter, David Keen, the boyfriend of the child's mother, confessed that he had thrown the child's body into the river and gave conflicting statements regarding the rape and murder.[2]

A Shelby County grand jury indicted Mr. Keen for first degree murder, murder in perpetration of rape, and aggravated rape, and the State announced that it would seek the death penalty. Mr. Keen entered a plea of guilty to all the charges in the Criminal Court for Shelby County, and the case was submitted to a jury for sentencing. The jury sentenced Mr. Keen to death for the first degree murder offense and twenty years imprisonment for the aggravated rape offense. When the case was automatically appealed to this Court, we remanded the case for a new sentencing hearing because of errors in the trial court's instructions to the jury. *State v. Keen*, 926 S.W.2d at 729-31, 735-36.

---

[2]For details of the crime, Mr. Keen's confession, and the sentencing hearing, see *State v. Keen*, 31 S.W.3d 196, 202-05 (Tenn. 2000) and *State v. Keen*, 926 S.W.2d 727, 730-31 (Tenn. 1994).

On August 15, 1997, a new jury sentenced Mr. Keen to death. The Court of Criminal Appeals affirmed the sentence. *State v. Keen*, No. 02C01-9709-CR-00365, 1999 WL 61058, at *23 (Tenn. Crim. App. Feb. 10, 1999). This Court likewise affirmed the sentence. *State v. Keen*, 31 S.W.3d at 225.

On May 3, 2001, Mr. Keen filed a pro se petition for post-conviction relief in the Criminal Court for Shelby County. The post-conviction court appointed counsel for Mr. Keen, and counsel filed an amended post-conviction petition. Following a hearing, the post-conviction court entered an order on August 2, 2004, denying post-conviction relief. The Court of Criminal Appeals affirmed the post-conviction court, and this Court declined to review the case. *Keen v. State*, No. W2004-02159-CCA-R3-PD, 2006 WL 1540258, at *53 (Tenn. Crim. App. June 5, 2006), *perm. app. denied* (Tenn. Oct. 30, 2006).

In February 2010, Mr. Keen received a score of 67 on the Wechsler Adult Intelligence Test, Fourth Edition ("WAIS-IV"). Based on this new score, Mr. Keen filed a motion in the Criminal Court for Shelby County, seeking to reopen his post-conviction proceedings in accordance with Tenn. Code Ann. § 40-30-117(a)(2) (2006). He asserted that the new I.Q. test score constituted "new scientific evidence" that he was "actually innocent" of the offense of first degree murder.[3] He argued that he was "actually innocent" because Tenn. Code Ann. § 39-13-203(b) (2010) prohibited imposing the death penalty on persons with a functional intelligence quotient of 70 or below. Although Mr. Keen presented several psychological issues as mitigating circumstances during his sentencing hearing,[4] he has not previously

---

[3]The 2010 WAIS-IV test was not the first I.Q. test administered to Mr. Keen. When he was nine years old, he received I.Q. test scores of 83 and 111 on the Wechsler Intelligence Scale for Children ("WISC"). When he was ten years old, he received a score of 76 on the Otis-Lennon School Ability Test ("Otis") and a score of 80 on the Comprehensive Test of Basic Skills ("CTBS"). At fifteen years of age, he received a score of 82 on the CTBS. One year later, he received a score of 84 on the CTBS. When he took the Wechsler Adult Intelligence Scale, Third Edition ("WAIS-III") in 2002, Mr. Keen received an I.Q. test score of 73.

[4]At the sentencing hearing, Mr. Keen presented testimony that, as a young child, he was malnourished, neglected, and frequently emotionally and physically abused. He had been diagnosed with serious depression, attention deficit disorder, and post-traumatic stress disorder with "psychotic-like symptoms." Mr. Keen presented the sentencing jury with the following statutory and non-statutory mitigating circumstances:

> (1) that the defendant has no significant history of criminal behavior; (2) that the murder was committed while the defendant was under the influence of extreme mental or emotional disturbance; (3) that the capacity of the defendant to appreciate the wrongfulness of his conduct or to conform to the requirements of the law was substantially impaired as a result of mental disease or defect or intoxication which was insufficient to establish a defense to the crime but which substantially affected his judgment; (4) that the defendant was

(continued...)

asserted that he was ineligible for the death penalty because he is intellectually disabled. Mr. Keen supported his motion to reopen with an expert affidavit taking issue with the validity of the scores he had received on earlier I.Q. tests.[5]

The trial court heard argument on February 18, 2011, to determine whether to proceed to an evidentiary hearing. In an order filed on March 28, 2011, the trial court concluded that Mr. Keen had "failed to establish by clear and convincing evidence that new scientific evidence exists establishing his actual innocence." More specifically, the court held that actual innocence under Tenn. Code Ann. § 40-30-117(a)(2) did not encompass ineligibility for the death penalty under Tenn. Code Ann. § 39-13-203(b).

Mr. Keen filed an application for permission to appeal in accordance with Tenn. Code Ann. § 40-30-117(c). In addition to arguing that his petition contained a viable basis for reopening his post-conviction proceeding in accordance with Tenn. Code Ann. § 40-30-117(a)(2), Mr. Keen raised an additional claim that he was entitled to reopen his post-conviction petition based on a new "constitutional right" under Tenn. Code Ann. § 40-30-117(a)(1). He argued that our decision in *Coleman v. State*, 341 S.W.3d 221 (Tenn. 2011), announced a new rule of constitutional criminal law that required retroactive application. The Court of Criminal Appeals rejected both of Mr. Keen's claims in an order filed on June

---

[4](...continued)

physically abused as a child; (5) that the defendant was sexually abused as a child; (6) that the defendant was abandoned and neglected as a child; (7) that the defendant was emotionally deprived as an infant and during early childhood; (8) that the defendant was deprived of nutrition as a child; (9) that the defendant did not receive continued counseling and psychotherapy for persons who are sexually and physically abused; (10) that the defendant has been diagnosed with attention deficit disorder; (11) that the defendant has been diagnosed as having post-traumatic stress disorder; (12) that the defendant was a productive citizen in our society prior to his arrest; having served our community in the military and been employed; (13) that the defendant acknowledges the seriousness of the crime he has committed and accepts responsibility for his actions; and (14) that the defendant is ashamed of his actions. The trial court also included a "catch-all" instruction to the jury that it could consider any other mitigating circumstances not specifically recited in the charge.

*State v. Keen*, 31 S.W.3d at 204-05 & n.1.

[5]Dr. Victoria Swanson's affidavit stated that Mr. Keen's WISC score of 111 was inflated due to the practice effect and that his WISC score of 83 should be adjusted to 76 due to the Flynn effect. Dr. Swanson also opined that Mr. Keen's WAIS-III score of 76 should be adjusted to 71 due to the Flynn effect and that his WAIS-IV score should be adjusted from 67 to 66 due to the Flynn effect. In addition, Dr. Swanson stated that Mr. Keen's scores on the Otis and CTBS tests "do not meet the 'gold standard' required in an *Atkins* [*v. Virginia*, 536 U.S. 304 (2002)] hearing" but they nevertheless "corroborate" his WISC, WAIS-III, and WAIS-IV scores.

29, 2011. Mr. Keen then filed an application for permission to appeal with this Court on August 31, 2011. We granted that application on December 14, 2011.

## II.

The issues presented in this case involve questions of statutory interpretation. The construction of a statute and its application to the facts of a particular case present questions of law which we review de novo. *State v. Russell*, ___ S.W.3d ___, ___, 2012 WL 4753429, at *2 (Tenn. Oct. 1, 2012); *State v. Marshall*, 319 S.W.3d 558, 561 (Tenn. 2010).

## III.

In 1990, the Tennessee General Assembly decided that intellectually disabled[6] persons who commit first degree murder should not be executed. Tenn. Code Ann. § 39-13-203(b). Tenn. Code Ann. § 39-13-203(a) defines "intellectual disability" in terms of a three-part test. In order to be found intellectually disabled, a person must demonstrate: "(1) Significantly subaverage general intellectual functioning as evidenced by a functional intelligence quotient (I.Q.) of seventy (70) or below; (2) Deficits in adaptive behavior; and (3) The intellectual disability must have been manifested during the developmental period, or by eighteen (18) years of age." In addition, Tenn. Code Ann. § 39-13-203(c) provides that "[t]he burden of production and persuasion to demonstrate intellectual disability by a preponderance of the evidence is upon the defendant. The determination of whether the defendant had intellectual disability at the time of the offense of first degree murder shall be made by the court."

This Court previously addressed motions to reopen in *Van Tran v. State*, 6 S.W.3d 257 (Tenn. 1999). In 1995, death row inmate Heck Van Tran filed a petition for post-conviction relief, asserting that he could not be executed because of the prohibition on executing intellectually disabled persons in Tenn. Code Ann. § 39-13-203(b). At the hearing on Mr. Van Tran's petition, two psychologists presented conflicting opinions regarding whether Mr. Van Tran's I.Q. was 67 or 72. Their opinions were based on Mr. Van Tran's performance on the Wechsler Adult Intelligence Scale Revised ("WAIS-R"). The post-conviction court credited the higher score offered by the state's psychologist and dismissed Mr. Van Tran's

---

[6]Act of Apr. 12, 1990, ch. 1038, 1990 Tenn. Pub. Acts 730 (codified as amended at Tenn. Code Ann. § 39-13-203 (2010)). In 2010, the General Assembly amended Tenn. Code Ann. § 39-13-203 by replacing the terms "mentally retarded" and "mental retardation" with "intellectual disability." Act of Apr. 9, 2010, ch. 734, 2010 Tenn. Pub. Acts 166, 166-67. The General Assembly noted that the former terminology was "increasingly considered to be derogatory and hurtful," contributed to "negative stereotypes," and was being abandoned by "states and organizations across the country." Consistent with the spirit of the 2010 Act, we have removed all references to "retardation" from this opinion.

petition. Both the Court of Criminal Appeals and this Court affirmed the post-conviction court's decision. *Van Tran v. State*, No. 02C01-9803-CR-00078, 1999 WL 177560, at \*6 (Tenn. Crim. App. Apr. 1, 1999); *Van Tran v. State*, 6 S.W.3d 257, 274.

Mr. Van Tran was re-tested in 1999 using the newer third edition of the Wechsler Adult Intelligence Scale ("WAIS-III"). At that time, the psychologist who administered this test determined that Mr. Van Tran's full-scale I.Q. was actually 65. In February 2000, Mr. Van Tran filed a motion to reopen his post-conviction proceeding, arguing that this new test result constituted "new scientific evidence" of his actual innocence under Tenn. Code Ann. § 40-30-117(a)(2). The post-conviction court denied his motion, and the Court of Criminal Appeals declined to grant him permission to appeal.

We accepted Mr. Van Tran's appeal. Following oral argument, we requested the parties to file supplemental briefs addressing the issue of whether executing an intellectually disabled person violated the "cruel and unusual punishments" clauses of the Eighth Amendment to the United States Constitution or Article I, § 16 of the Tennessee Constitution.[7] *Van Tran v. State*, 66 S.W.3d 790, 794 (Tenn. 2001).

This Court granted Mr. Van Tran's motion to reopen his post-conviction proceeding based on the first prong of Tenn. Code Ann. § 40-30-117(a), which provides for relief when an appellate court announces a new "constitutional right."[8] Applying the three-prong test for determining whether a particular punishment is "cruel and unusual,"[9] we held that executing

---

[7]U.S. Const. amend. VIII states: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." Tenn. Const. Art. I, § 16 states that "excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." This Court has held, and repeatedly affirmed, that capital punishment itself does not violate the state and federal constitutions. *See State v. Black*, 815 S.W.2d 166, 188-91 (Tenn. 1991) (noting that, among other rationales, the Tennessee Constitution expressly references capital punishment in two places).

[8]Although Mr. Van Tran's motion to reopen alleged that he had new scientific evidence that he was actually innocent under Tenn. Code Ann. § 40-30-117(a)(2), it was our view that his motion was "more appropriately based on the provisions of [Tenn. Code Ann. § 40-30-117(a)(1)], which provides that the 'claim in the motion is based upon a final ruling of an appellate court establishing a constitutional right that was not recognized as existing at the trial, if retrospective application of that right is required.'" *Van Tran v. State*, 66 S.W.3d at 811-12.

[9]In *State v. Black*, we adopted the test for "cruel and unusual punishment" that was announced by the United States Supreme Court in *Gregg v. Georgia*, 428 U.S. 153, 173 (1976), as modified by the New Jersey Supreme Court in *State v. Ramseur*, 106 N.J. 123, 524 A.2d 188, 210 (1987):

First, does the punishment for the crime conform with contemporary standards of decency? Second, is the punishment grossly disproportionate to the offense? Third, does the

(continued...)

intellectually disabled persons violated "the evolving standards of decency that mark the progress of a maturing society." *Van Tran v. State*, 66 S.W.3d at 812. Our conclusion was buttressed by the fact that after the United States Supreme Court upheld the execution of mentally disabled individuals in *Penry v. Lynaugh*, 492 U.S. 302 (1989), sixteen states and the federal government had passed legislation prohibiting the practice. *Van Tran v. State*, 66 S.W.3d at 802. We also held that such executions were "grossly disproportionate" and served "no valid penological purpose." We therefore found that executing an intellectually disabled defendant would violate the state and federal constitutions. *Van Tran v. State*, 66 S.W.3d at 812.

We also determined that the holding in *Van Tran* should apply retroactively. This finding involved a two-part analysis. The first question was whether the "constitutional right" is actually "new." A constitutional rule is considered "new" when "the result was not *dictated* by precedent existing at the time the defendant's conviction became final." *Van Tran v. State*, 66 S.W.3d at 811 (quoting *Teague v. Lane*, 489 U.S. 288, 301 (1989)). Second, a new constitutional right is applied retroactively when it "materially enhances the integrity and reliability of the fact finding process of the trial." *Van Tran v. State*, 66 S.W.3d at 811 (citing *Meadows v. State*, 849 S.W.2d 748, 755 (Tenn. 1993)); *see also* Tenn. Code Ann. § 40-30-122 (2006) (citing the federal standard for retroactivity under *Teague v. Lane*, 489 U.S. at 307). Applying these standards, we determined that our holding in *Van Tran* was new, and that it warranted retroactive application. *Van Tran v. State*, 66 S.W.3d at 811.

The following year, the United States Supreme Court overruled its holding in *Penry v. Lynaugh*. In *Atkins v. Virginia*, 536 U.S. 304 (2002), the Supreme Court employed an analysis similar to the one we used in *Van Tran* and likewise held that executing intellectually disabled persons constituted cruel and unusual punishment under the Eighth Amendment to the United States Constitution. *Atkins v. Virginia*, 536 U.S. at 321.

In December 2002, relying on the recent holdings of *Van Tran* and *Atkins* as new, retroactive constitutional rules, condemned prisoner Michael Wayne Howell filed a motion to reopen his post-conviction proceeding under Tenn. Code Ann. § 40-30-117(a)(1). *Howell v. State*, 151 S.W.3d 450, 453 (Tenn. 2004). The post-conviction court and Court of Criminal Appeals denied Mr. Howell's motion. However, we remanded Mr. Howell's intellectual disability claim to the post-conviction court for consideration under the "colorable claim" standard of Tenn. Sup. Ct. R. 28, §§ 2(H), 6(B)(6) (2012), rather than the

[9](...continued)
punishment go beyond what is necessary to accomplish any legitimate penological objective[?]

*State v. Black*, 815 S.W.2d at 189.

"clear and convincing evidence" standard of Tenn. Code Ann. § 40-30-117(a)(4). *Howell v. State*, 151 S.W.3d at 460-63. Mr. Howell's position was unusual and almost unique: he was "able, for the first time in his motion to reopen . . ., to claim ineligibility for the death penalty" under the newly-decided *Van Tran* and *Atkins* decisions. *Howell v. State*, 151 S.W.3d at 453. Therefore, under these very specific facts, we held that applying the stringent "clear and convincing" evidence standard would violate due process notions of fundamental fairness. *Howell v. State*, 151 S.W.3d at 462-63.

We also addressed shortcomings in the expert proof Mr. Howell submitted to support his claim that he was intellectually disabled. The psychologist who examined Mr. Howell administered the WAIS-III, as well as the Stanford-Binet Intelligence Test - Fourth Edition and the Comprehensive Test of Nonverbal Intelligence ("CTONI"). Although Mr. Howell's score on the WAIS-III was above 70, his scores on the other tests were below 70. Thereafter, the psychologist prepared an affidavit stating that an I.Q. test score of 70 actually represented "a band or zone of sixty-five to seventy-five." *Howell v. State*, 151 S.W.3d at 453. Accordingly, the psychologist opined that Mr. Howell's level of intellectual functioning was "within the [intellectual disability] range of intelligence." *Howell v. State*, 151 S.W.3d at 453-54. The post-conviction court relied completely on Mr. Howell's raw score on the WAIS-III, ignored the other tests, and found, without a hearing, that Mr. Howell had not put forth a prima facie case of intellectual disability. *Howell v. State*, 151 S.W.3d at 454-55, 459.

When Mr. Howell's case reached this Court, we noted that "[w]ithout question," intellectual disability "is a difficult condition to accurately define" and that "[g]enerally accepted definitions within the scientific community will no doubt be refined as our knowledge in this area advances." *Howell v. State*, 151 S.W.3d at 457. Nevertheless, we found that Tenn. Code Ann. § 39-13-203 was "perfectly clear and unambiguous" and that it made "no reference to . . . any range of scores above the score of seventy." *Howell v. State*, 151 S.W.3d at 458. After noting that the Tennessee General Assembly had adopted a more relaxed definition of intellectual disability in the social services context that contained no reference to I.Q. test scores,[10] we concluded that the General Assembly intended "to have a different, more restrictive, standard apply to defendants in a capital prosecution." *Howell v. State*, 151 S.W.3d at 458. Accordingly, we found that the General Assembly "intended to create . . . a bright line rule" when it defined "intellectual disability" in Tenn. Code Ann. § 39-13-203(a)(1) as having a "functional intelligence quotient (I.Q.) of seventy (70) or below." *Howell v. State*, 151 S.W.3d at 457-58.

With regard to Mr. Howell's argument that the post-conviction court erred by disregarding the scores from other tests besides the WAIS-III, we noted that the United States

---

[10]This definition of "intellectual disability" is currently codified at Tenn. Code Ann. § 33-1-101(16) (2012).

Supreme Court had referred to the WAIS-III as "the standard instrument in the United States for assessing intellectual functioning." *Atkins v. Virginia*, 536 U.S. at 309 n.5. However, we also found that

> there is nothing in the record to indicate that other tests, such as the Stanford–Binet Intelligence Test–Fourth Edition, or the CTONI are not also accurate I.Q. tests. A court may certainly give more weight to one test, but should do so only after *fully analyzing and considering all evidence presented*. . . . A review under [the colorable claim standard] would necessarily include giving full and fair consideration to all tests administered to the petitioner.

*Howell v. State*, 151 S.W.3d at 459 (emphasis added).

Regrettably, several courts misconstrued our holding in *Howell* that Tenn. Code Ann. § 39-13-203(a)(1) established a "bright line rule" for determining intellectual disability. They understood this language to mean that courts could consider *only* raw I.Q. scores. Accordingly, these courts tended to disregard any evidence suggesting that raw scores could paint an inaccurate picture of a defendant's actual intellectual functioning. *See, e.g., Smith v. State*, No. E2007-00719-CCA-R3-PD, 2010 WL 3638033, at *40 (Tenn. Crim. App. Sept. 21, 2010) (reluctantly refusing to consider the Flynn effect); *Coleman v. State*, No. W2007-02767-CCA-R3-PD, 2010 WL 118696, at *14, 16-18, 23 (Tenn. Crim. App. Jan. 13, 2010) (upholding, under *Howell*, a trial court's refusal to consider the standard error of measurement and the Flynn effect in determining the petitioner's I.Q. score); *Black v. State*, No. M2004-01345-CCA-R3-PD, 2005 WL 2662577, at *14, 17-18 (Tenn. Crim. App. Oct. 19, 2005) (rejecting the Flynn effect under the "bright-line cutoff" rule of *Howell*). This was an inaccurate reading of *Howell*, in which we took pains to say that the trial court should "giv[e] full and fair consideration to all tests administered to the petitioner" and should "fully analyz[e] and consider[] all evidence presented" concerning the petitioner's I.Q. *Howell v. State*, 151 S.W.3d at 459.

The case of *Coleman v. State* provided us with an opportunity to clarify and reinforce our holding in *Howell*. We held that "the plain language of Tenn. Code Ann. § 39-13-203(a)(1) does not limit to raw test scores the evidence regarding whether a criminal defendant is a person with intellectual disability." *Coleman v. State,* 341 S.W.3d at 230. We also recognized that there was an "'imperfect fit' between the clinical community's and the legal system's view of intellectual disability." *Coleman v. State*, 341 S.W.3d at 230 (quoting American Psychiatric Ass'n, *Diagnostic and Statistical Manual on Mental Disorders* xxxiii (4th ed. text rev. 2000) ("DSM-IV-TR")). In addition, we noted that "[t]he term 'intellectual disability' does not refer to a single disorder or disease, but rather to a heterogeneous set of

disabilities that affect the level of a person's functioning in defined domains," and that "[p]ersons with intellectual disabilities frequently have other psychological and physical disorders." Thus, "the definition of 'intellectual disability' embraces a heterogeneous population ranging from persons who are totally dependent to persons who are nearly independent." But all of them "have a significantly reduced ability to cope with and function independently in the everyday world." *Coleman v. State*, 341 S.W.3d at 230-31.

We then considered the four prior cases in which we had been called on to interpret and apply Tenn. Code Ann. § 39-13-203 – *State v. Smith*, 893 S.W.2d 908 (Tenn. 1994); *Van Tran v. State*, 66 S.W.3d 790 (Tenn. 2001); *Howell v. State*, 151 S.W.3d 450 (Tenn. 2004); and *State v. Strode*, 232 S.W.3d 1 (Tenn. 2007). From these cases, we gleaned "six principles" that have guided our approach to this statute:

> (1) The public policy of this State, reflected in the considered decision of the Tennessee General Assembly to enact Tenn. Code Ann. § 39-13-203, opposes the execution of persons with intellectual disabilities.
>
> (2) The scope of Tenn. Code Ann. § 39-13-203 is more restrictive than the definition of "intellectual disability" in Tenn. Code Ann. § 33-1-101(16) applicable to the provision of support services to persons with intellectual disabilities.
>
> (3) The Court will give effect to the plain and ordinary meaning of the statute's language.
>
> (4) The Court will decline to "read in" language into the statute that the General Assembly did not place there.
>
> (5) The Court's application of the statute may be guided and informed by the clinical standards, criteria, and practices customarily used to assess and diagnose intellectual disability.
>
> (6) In instances where the proper application of the statute is not clear, the Court may confirm its interpretation of the statute by considering its legislative history, prior interpretations of the statute, similar statutes in other jurisdictions, and the clinical standards, criteria, and practices customarily used to assess and diagnose intellectual disability.

*Coleman v. State*, 341 S.W.3d at 235-40 (footnotes omitted).  With regard to the importance of raw I.Q. test scores, we observed that:

> While a person's I.Q. is customarily obtained using standardized intelligence tests, *see Van Tran v. State,* 66 S.W.3d at 795; DSM-IV-TR, at 41, the statute does not provide clear direction regarding how a person's I.Q. should be determined and does not specify any particular test or testing method that should be used.  *Howell v. State,* 151 S.W.3d at 459.  In fact, the statute does not even employ the words "test" or "score."

*Coleman v. State*, 341 S.W.3d at 241.

Therefore, we held that Tenn. Code Ann. § 39-13-203(a)(1) "does not require a 'functional intelligence quotient *test score* of seventy (70) or below,'" and that "the trial courts may receive and consider any relevant and admissible evidence regarding whether the defendant's functional I.Q. at the time of the offense was seventy (70) or below." *Coleman v. State*, 341 S.W.3d at 241.  We also held that the trial court "is not required to follow the opinion of any particular expert" but that the trial court "must give full and fair consideration to *all the evidence presented*, including the results of all the I.Q. tests administered to the defendant." *Coleman v. State*, 341 S.W.3d at 242 (emphasis added).

We also noted in *Coleman* that the American Association on Intellectual and Developmental Disabilities ("AAIDD") recognizes ten potential "challenges" to the reliability and validity of I.Q. test scores, including the Flynn effect and the practice effect. *Coleman v. State*, 341 S.W.3d at 242 n.55 (citing Am. Ass'n on Intellectual and Developmental Disabilities, *Intellectual Disability: Definition, Classification, and Systems of Supports* 36-41 (11th ed. 2010) ("AAIDD Manual")).  In other words, we held that a court could find, based on expert testimony, that a defendant's actual I.Q. may be higher or lower than what a raw test score indicates:

> Because intelligence tests are indirect rather than direct measures of intelligence, experts in the field recognize that they, like other measures of human functioning, are not "actuarial determination[s]," that these tests cannot measure intelligence with absolute precision and that these tests contain a potential for error.  The current consensus is that the standard error of measurement in well-standardized intelligence tests is approximately three to five points.

*Coleman v. State*, 341 S.W.3d at 245 (alteration in original) (footnotes omitted) (quoting AAIDD Manual, at 40).

We take the opportunity to reiterate that, in determining whether a defendant's functional I.Q. is 70 or below, a trial court should consider all the evidence that is admissible under the rules for expert testimony. *See State v. Copeland*, 226 S.W.3d 287, 301-02 (Tenn. 2007); Tenn. Code Ann. § 40-30-117(b). As we stated in *Coleman*:

> [I]f the trial court determines that professionals who assess a person's I.Q. customarily consider a particular test's standard error of measurement, the Flynn Effect, the practice effect, or other factors affecting the accuracy, reliability, or fairness of the instrument or instruments used to assess or measure the defendant's I.Q., an expert should be permitted to base his or her assessment of the defendant's "functional intelligence quotient" on a consideration of those factors.[11]

---

[11]The "Flynn effect" is the name given to the verified worldwide phenomenon that I.Q. scores, since the beginning of intelligence testing, have tended to rise overall at a rate of 0.3 per year, or three points every decade. When an I.Q. test is created, it is calibrated so that the mean score equals an I.Q. of 100. Over time, as the scores of the general population increase at the rate of the Flynn effect, or three points per decade, the scores become more and more inaccurate in terms of gauging an individual's I.Q. relative to the general population. To compensate for the Flynn effect, I.Q. tests have to be routinely revised or "renormed" to make them more difficult. Thus, the WAIS gave way to the WAIS-R, which was eventually replaced by the WAIS-III, and now the current WAIS-IV. Under the Flynn effect, a recently-obtained WAIS-IV score will be close to accurate, while a WAIS-III score that was obtained ten years after the test was renormed would need to be reduced by approximately three points to capture the test-taker's actual I.Q. at the time. *See* Geraldine W. Young, *A More Intelligent and Just Atkins: Adjusting for the Flynn Effect in Capital Determinations of Mental Retardation or Intellectual Disability*, 65 Vand. L. Rev. 615, 616, 621, 624-25 (2012); AAIDD Manual, at 37; James R. Flynn, *Tethering the Elephant: Capital Cases, IQ, and the Flynn Effect*, 12 Psychol. Pub. Pol'y & L. 170, 173-74, 179-81 (2006).

In addition to the consideration of the Flynn effect, the AAIDD and APA stress that I.Q. scores should be considered in light of the standard error of measurement ("SEM") and the practice effect. SEM posits that I.Q. scores are best understood as a range, to account for the possibility of error in the determination of an I.Q. score, which is a somewhat subjective determination. There is an uncomfortable fit between SEM and Tennessee's statute, which contains a bright-line cutoff of 70. Nevertheless, consideration of the SEM can aid a trial court as it weighs the various data concerning a particular defendant's mental acuity. The practice effect refers to the fact that people who take multiple I.Q. tests tend to score better over time, so higher scores on later tests may need to be adjusted downward to account for this increase. *See* AAIDD Manual, at 38; John H. Blume et. al., *Of Atkins and Men: Deviations from Clinical Definitions of Mental Retardation in Death Penalty Cases*, 18 Cornell J.L. & Pub. Pol'y 689, 695, 697-703 (2009); LaJuana Davis, *Intelligence Testing and Atkins: Considerations for Appellate Courts and Appellate Lawyers*, 5 J. App. Prac. & Process 297, 301-02, 309-10 (2003); *see also Thomas v. Allen*, 607 F.3d 749, 753,

(continued...)

*Coleman v. State*, 341 S.W.3d at 242 n.55 (footnote added).

The case of *Smith v. State*, 357 S.W.3d 322 (Tenn. 2011) presented us with our first opportunity to apply *Coleman's* principles. Leonard Smith's case came to us via a petition for post-conviction relief, not a motion to reopen. Mr. Smith had been sentenced to death for a felony murder that occurred in 1995. Mr. Smith applied for post-conviction relief in 1999. *Van Tran*, *Atkins*, and *Coleman* were decided while his case was working its way through the courts. We vacated his death sentence. Because the judge who presided over Mr. Smith's sentencing hearing had previously prosecuted Mr. Smith in another matter during Mr. Smith's murder trial, we found that Mr. Smith's due process right to an impartial tribunal had been violated. *Smith v. State*, 357 S.W.3d at 345.

We also held that Mr. Smith was entitled to a new hearing on whether he was intellectually disabled. At his first hearing, a psychologist opined that Mr. Smith was intellectually disabled when he committed the crime. The evidence indicated that Mr. Smith had brain injuries and a history of physical abuse, as well as alcohol and drug abuse. As a teenager, Mr. Smith's two scores on the Ammons Quick Test indicated an I.Q. of 70 and 84. His contemporaneous WISC test provided a full-scale I.Q. score of 80. Mr. Smith's 1989 WAIS-R score was 75, and his 2000 and 2002 WAIS-III scores were 77 and 65 respectively. His scores on academic tests were also very low. *Smith v. State*, 357 S.W.3d at 350-53.

Although the post-conviction court found that Mr. Smith satisfied the second and third prongs of the test for intellectual disability, the court decided that he had not proven that he had an I.Q. of 70 or below before the age of eighteen. *Smith v. State*, 357 S.W.3d at 353. Significantly, the court stated that "testing performed before the age of eighteen reflects a functional IQ of 85," and that "the arguments for margin of error are contrary to case law of this state and of no assistance to the petitioner." *Smith v. State*, 357 S.W.3d at 353. We held that "the post-conviction court misapplied the applicable legal standard when it ruled that Smith's arguments regarding standard margin of error concerning intelligence tests were 'contrary to the case law of this state and of no assistance' to Smith." Therefore, we remanded the case to give Mr. Smith and the State an opportunity to present evidence

---

[11](...continued)
757-58 (11th Cir. 2010) (finding no clear error in a trial court's application of the Flynn effect and the standard error of measurement); *Holladay v. Allen*, 555 F.3d 1346, 1357-58 (11th Cir. 2009) (upholding a finding of intellectual disability that took into account the Flynn effect and the practice effect); *Cole v. Branker*, 328 Fed. App'x 149, 156-57 (4th Cir. 2008) (acknowledging the Flynn effect and the practice effect, but finding them insufficient to adjust the petitioner's I.Q. below 70); *Walker v. True*, 399 F.3d 315, 322 (4th Cir. 2005) (remanding for consideration of the Flynn effect and standard error of measurement). In light of Tennessee's strongly-held public policy against executing the intellectually disabled, this sort of information would be acutely relevant to a trial court attempting to determine whether a particular defendant's I.Q. is 70 or below.

regarding his functional intelligence quotient in light of *Coleman*.[12] *Smith v. State*, 357 S.W.3d at 354.

## IV.

Having reviewed the legal predicate for claims of intellectual disability under Tenn. Code Ann. § 39-13-203, we now turn to the claims Mr. Keen presents in his motion to reopen his post-conviction proceedings. We will address the claims in statutory order. The first question is whether *Coleman v. State* announced a new constitutional rule that must be retroactively applied. The second question is whether Mr. Keen's intellectual disability claim can be heard under the actual innocence prong of the motion-to-reopen statute.

## A.

A preliminary issue is whether Mr. Keen's intellectual disability claim has been properly raised. In a petition for post-conviction relief, a ground for relief is generally deemed waived if the petitioner had an opportunity to raise the issue previously, but failed to do so. Tenn. Code Ann. § 40-30-106(g) (2012).

The statutory prohibition against executing intellectually disabled persons was in effect during both of Mr. Keen's sentencing hearings, his two appeals, and his initial post-conviction proceeding. However, Mr. Keen did not invoke Tenn. Code Ann. § 39-13-203 in any of these proceedings. If Mr. Keen was indeed ineligible for the death penalty because he was intellectually disabled, then the attorneys representing Mr. Keen "failed to take whatever action was reasonably available to prevent or nullify the harmful effect" of that error. Tenn. R. App. P. 36(a).

However, Mr. Keen's current appeal comes to us via a motion to reopen his post-conviction proceeding under Tenn. Code Ann. § 40-30-117. A motion to reopen is only available when the petitioner can establish by clear and convincing evidence that either (1) an appellate court has made a final ruling recognizing a new constitutional right that requires retroactive application; (2) new scientific evidence has come to light that establishes the petitioner is "actually innocent of the offense or offenses for which the petitioner was convicted;" or (3) the petitioner's sentence was enhanced due to a previous conviction which was later found to be invalid. Tenn. Code Ann. § 40-30-117(a).

---

[12]Heck Van Tran and Michael Wayne Howell remain on Tennessee's death row. *See* http://www.tn.gov/correction/deathrowlist.html. Shortly after our holding in *Coleman v. State*, Michael Angelo Coleman's death sentence was reduced to a life sentence.

In *Van Tran v. State*, we recognized that a motion to reopen is the proper vehicle for a claim that arises after the petitioner's original post-conviction avenues have been exhausted and that asserts a newly recognized constitutional right, even when the issue was arguably waived. *Van Tran v. State*, 66 S.W.3d at 799 (accepting the appeal of a "new scientific evidence" motion to reopen and converting the motion into a "new constitutional right" motion). Although nothing in the statute prevents the waiver provision of Tenn. Code Ann. § 40-30-106(g) from applying to motions to reopen, we found in *Van Tran* that the narrow circumstances that trigger a motion to reopen may "raise serious constitutional implications of first impression," so this Court is free "to address these critical issues." Due to "the importance of correctly resolving constitutional issues," we held that "constitutional issues should rarely be foreclosed by procedural technicalities." *Van Tran v. State*, 66 S.W.3d at 799 (quoting *In re Adoption of E.N.R.*, 42 S.W.3d 26, 32 (Tenn. 2001)). Furthermore, as in *Van Tran*, the parties in this case failed to raise the issue of waiver in their briefs.

Like the Tenn. Code Ann. § 40-30-117(a)(1) motion in *Van Tran*, motions to reopen that assert actual innocence based on new evidence under Tenn. Code Ann. § 40-30-117(a)(2) similarly raise important constitutional due process concerns. These motions thus warrant the same forgiving treatment as motions to reopen based on a new constitutional rule under Tenn. Code Ann. § 40-30-117(a)(1). Therefore, in light of the narrowness and constitutional gravity of motions to reopen under Tenn. Code Ann. § 40-30-117(a)(1) and (2), we find that a motion to reopen is the proper vehicle for bringing such claims, in spite of circumstances that might otherwise suggest that the issue has been waived.

**B.**

Mr. Keen bases his motion to reopen on two grounds. The first is Tenn. Code Ann. § 40-30-117(a)(1), which applies to claims "based upon a final ruling of an appellate court establishing a constitutional right that was not recognized as existing at the time of trial, if retrospective application of that right is required." Under this statute, the motion must be filed within one year of the ruling that establishes the new constitutional right.

Mr. Keen filed his motion to reopen on August 5, 2010. At first, his motion was based on Tenn. Code Ann. § 40-30-117(a)(2) and alleged that he had acquired "new scientific evidence" that he was "actually innocent" of the death penalty on account of his intellectual disability. The post-conviction court denied his motion on March 28, 2011. Mr. Keen appealed. We released *Coleman v. State* on April 11, 2011, while Mr. Keen's case was pending before the Court of Criminal Appeals. In his reply brief filed in the Court of Criminal Appeals, Mr. Keen asserted that *Coleman* announced a new, retroactive, constitutional rule. Although Mr. Keen's motion was filed *before* our holding in *Coleman*, we find that it was indeed "filed within one (1) year" of that ruling. Tenn. Code Ann. § 40-30-117(a)(1).

-15-

We must first determine whether *Coleman* established "a constitutional right that was not recognized as existing at the time of trial." Only if *Coleman* qualifies as a new "constitutional right" will we then consider whether its holding requires "retrospective application." Mr. Keen argues that *Coleman* "establish[ed] a new retroactive rule for proving an intellectual disability in Tennessee under the Eighth Amendment," and that he has raised this issue within one year of that ruling.

As we have already noted, our holding in *Van Tran*–that executing an intellectually disabled person violated the state and federal constitutions–announced a new constitutional right that required retrospective application. *Van Tran v. State*, 66 S.W.3d at 811. Indeed, our holding in *Van Tran* was explicitly constitutional and was expressly based on the "cruel and unusual punishments" clauses of the federal and state constitutions. Michael Angelo Coleman and Leonard Smith were among those who took advantage of the one-year window created by *Van Tran* for reopening post-conviction proceedings.

*Coleman* was quite different from *Van Tran*. In *Coleman*, we were not called upon to interpret the constitution. Instead, *Coleman* concerned the interpretation of Tenn. Code Ann. § 39-13-203, the statute that defined intellectual disability in the context of the death penalty. *Coleman* supplemented *Howell* and clarified that "the trial courts may receive and consider any relevant and admissible evidence regarding whether the defendant's functional I.Q. at the time of the offense was seventy (70) or below." *Coleman v. State*, 341 S.W.3d at 241. We held in *Coleman* that the courts were not limited to raw test scores, but could also consider other factors, such as the Flynn effect, the practice effect, standard error of measurement, malingering, and cultural differences. *Coleman v. State*, 341 S.W.3d at 242 n.55, 247. *Coleman* recognized no new constitutional right. The only constitutional right at issue in *Coleman* was the one we had already announced ten years earlier in *Van Tran*.[13]

_____

[13]The United States Court of Appeals for the Sixth Circuit analyzed *Coleman* shortly after its release. Although the panel disagreed on whether *Coleman* primarily interpreted *Atkins* or the Tennessee Code, both the majority and the dissent viewed *Coleman* as a clarification of existing law. The majority characterized *Coleman*'s holding as an "elucidation of the *Atkins* standard under Tennessee law." *Black v. Bell*, 664 F.3d 81, 92, 96, 101 (6th Cir. 2011) (remanding Black's intellectual disability claim to the U.S. District Court for reconsideration in light of *Coleman*). Judge Boggs, in dissent, offered a more accurate assessment:

In *Coleman v. State*[,] . . . the Tennessee Supreme Court construed a Tennessee statute prohibiting the execution of [intellectually disabled] defendants under Tennessee law. . . . *Coleman* is purely a construction of a state statute that makes only fleeting references to *Atkins*. . . .
. . . .
. . . . *Coleman* decided how a Tennessee state statute should apply to a Tennessee state court opinion [i.e., *Van Tran*] decided under the Tennessee state Constitution.

(continued...)

Mr. Keen cannot piggyback *Coleman* on top of *Van Tran* in order to reopen the one-year statutory window for a constitutional rule that was articulated over a decade ago.

Because we have determined that *Coleman*'s holding, which concerned the interpretation and application of Tenn. Code Ann. § 39-13-203, was not a constitutional ruling, there is no need to inquire whether that holding would qualify as a "new rule." Nor is there any use in discussing retroactivity.[14]  *See Teague v. Lane*, 489 U.S. 288, 301, 307 (1989); *Meadows v. State*, 849 S.W.2d at 751, 755; *see also* Tenn. Code Ann. § 40-30-122 (2012). We also have no need to discuss whether Mr. Keen's claim would be subject to the "clear and convincing evidence" standard of Tenn. Code Ann. § 40-30-117(a)(4) or, as he argues, the "colorable claim" standard of Tenn. Sup. Ct. R. 28, §§ 2(H), 6(B)(6) that we applied in *Howell v. State*, 151 S.W.3d at 460-63.

## C.

Having determined that *Coleman v. State* did not announce a new constitutional right, we now turn to Mr. Keen's original grounds for reopening his petition for post-conviction relief. The question we must decide is whether the result of his WAIS-IV test taken in 2010 constitutes "new scientific evidence" that he is "actually innocent of the offense or offenses" for which he was convicted for the purpose of a claim under Tenn. Code Ann. § 40-30-

---

[13](...continued)
*Black v. Bell*, 664 F.3d at 107-08 (Boggs, J., dissenting).

For other cases analyzing whether one of our holdings announced a new constitutional right, see *Miller v. State*, 54 S.W.3d 743, 746-47 (Tenn. 2001) (explaining that *State v. Brown*, 836 S.W.2d 530 (Tenn. 1992) did not announce a new constitutional right, but "simply reiterated" Tennessee law); *Mitchell v. State*, No. M2011-02030-CCA-R3-PC, 2012 WL 2308294, at *2-3 (Tenn. Crim. App. June 15, 2012) (finding that *Lane v. State*, 316 S.W.3d 555 (Tenn. 2010) did not announce a new constitutional right, but "applied well-established rules of law"); *Coury v. Westbrooks*, No. M2003-01800-CCA-R3-PC, 2004 WL 2346151, at *2-3 (Tenn. Crim. App. Oct. 19, 2004) (finding that *Dixon v. Holland*, 70 S.W.3d 33 (Tenn. 2002), rather than announcing a new constitutional right, clarified existing law).

[14]Contrary to Mr. Keen's arguments, *Smith v. State* does not support the proposition that *Coleman* was a new, retroactive, constitutional rule. Mr. Keen suggests that we remanded Leonard Smith's case under the same "new right" rationale we applied in *Van Tran.* To the contrary, *Coleman* and *Smith* were not like *Van Tran*. In *Van Tran*, we recognized a new constitutional right, and then remanded the petitioner's case for reconsideration of that right. In *Coleman* and *Smith*, by contrast, the post-conviction courts had applied an incorrect legal standard to a claim of intellectual disability under Tenn. Code Ann. § 39-13-203. We remanded those cases for reconsideration under the correct standard articulated in *Coleman*. *See Smith v. State*, 357 S.W.3d at 353-54; *Coleman v. State*, 341 S.W.3d at 253. In Mr. Keen's case, however, the post-conviction court did *not* apply an incorrect legal standard. As we will soon explain, that court correctly determined that a death- sentence-ineligibility claim was not cognizable under Tenn. Code Ann. § 40-30-117(a)(2) and properly denied Mr. Keen's motion.

117(a)(2). Mr. Keen asserts that evidence supporting his claim that he is intellectually disabled for the purpose of Tenn. Code Ann. § 39-13-203(b) is tantamount to evidence that he is "actually innocent" for the purpose of Tenn. Code Ann. § 40-30-117(a)(2). This assertion requires us to construe the phrase "actually innocent of the offense" in Tenn. Code Ann. § 40-30-117(a)(2).[15]

It is now axiomatic that our role in construing a statute is to "ascertain and give effect to the legislative intent without unduly restricting or expanding a statute's coverage beyond its intended scope." *State v. Strode*, 232 S.W.3d 1, 9 (Tenn. 2007). To do this, we focus initially on the statute's words, giving these words their natural and ordinary meaning in light of their statutory context. *Lee Med., Inc. v. Beecher,* 312 S.W.3d 515, 526 (Tenn. 2010). We avoid any "forced or subtle construction that would limit or extend the meaning of the language." *Eastman Chem. Co. v. Johnson*, 151 S.W.3d 503, 507 (Tenn. 2004). "[E]very word in a statute is presumed to have meaning and purpose." *U.S. Bank, N.A. v. Tennessee Farmers Mut. Ins. Co.,* 277 S.W.3d 381, 386 (Tenn. 2009). If the statutory language is clear and unambiguous, we apply the statute's plain language in its normal and accepted use. We need look no further than the statute itself, enforcing it just as it is written. *Shelby Cnty. Health Care Corp. v. Nationwide Mut. Ins. Co.*, 325 S.W.3d 88, 92 (Tenn. 2010); *Eastman Chem. Co. v. Johnson*, 151 S.W.3d at 507.

On their faces, the words "actually" and "innocent" appear clear enough. They denote that the person in question truly did not commit the crime for which they have been convicted. However, the courts have expanded the concept of actual innocence to include the idea that someone could be actually innocent of, i.e., ineligible for, a given sentence. Under this parlance, for example, a minor or an intellectually disabled person can be said to be "actually innocent" of the death penalty, due to their inherent ineligibility for such a sentence. In other words, "actual innocence" has become a legal term of art that implies more than what the words themselves suggest. *See Sawyer v. Whitley*, 505 U.S. 333, 336, 340-41, 343-47 (1992) (discussing how to determine whether an inmate is "innocent of death").

In 1996, Congress undertook to restrict the scope of "actual innocence" for the purpose of federal habeas corpus when it enacted the Antiterrorism and Effective Death Penalty Act ("AEDPA"). Under the AEDPA, federal courts must dismiss a second or subsequent habeas corpus petition unless newly discovered evidence establishes, by "clear and convincing evidence," that "no reasonable factfinder" would have found the applicant

---

[15]The same language occurs in Tenn. Code Ann. § 40-30-102(b)(2) (2012) (concerning "[w]hen prisoners may petition for post-conviction relief"). Act of Apr. 26, 1995, ch. 207, § 1, 1995 Tenn. Pub. Acts 305, 305. Both subsections of the Act were passed simultaneously by the General Assembly. The language is identical. Our analysis applies equally to both statutes.

"guilty of the offense" or "guilty of the underlying offense." 28 U.S.C. §§ 2244, 2255 (2006). This language, "guilty of the offense," has been interpreted by the federal courts to reflect Congress' intent that federal habeas relief under these statutes not be available to challenge a *sentence* – even a death sentence. *Henderson v. Thaler*, 626 F.3d 773, 779-81 (5th Cir. 2010); *In re Webster*, 605 F.3d 256, 257-58 (5th Cir. 2010); *In re Dean*, 341 F.3d 1247, 1248-49 (11th Cir. 2003); *Hope v. United States*, 108 F.3d 119, 120 (7th Cir. 1997).

The year before Congress enacted the AEDPA, the Tennessee General Assembly enacted the Post-Conviction Procedure Act,[16] which includes Tenn. Code Ann. § 40-30-117, the statute governing motions to reopen post-conviction proceedings. In order to reopen the post-conviction process under § 40-30-117(a)(2), an inmate must present evidence that he is "actually innocent of the offense or offenses" for which he was convicted.

This Court has not squarely addressed the meaning of "actually innocent of the offense" in Tenn. Code Ann. § 40-30-117(a)(2), although Justice Barker, joined by Justice Holder, did so in a dissenting opinion in *Van Tran*. In his dissenting opinion, Justice Barker equated the "actually innocent of the offense" language in Tenn. Code Ann. § 40-30-117(a)(2) with the AEDPA's new "not guilty of the offense" language. *Van Tran v. State*, 66 S.W.3d at 822 (Barker, J., dissenting) (citing *Hope v. United States,* 108 F.3d 119, 120 (7th Cir.1997) and *Greenawalt v. Stewart*, 105 F.3d 1287, 1287-88 (9th Cir. 1997)).

Justice Barker's separate opinion cites with favor Judge Richard Posner's opinion in *Hope v. United States*, in which Judge Posner found it "highly unlikely that Congress intended the word ['offense'] to bear a special meaning." *Hope v. United States*, 108 F.3d 119, 120 (7th Cir. 1997). Like Judge Posner, Justice Barker concluded that the Tennessee General Assembly, like Congress, had chosen the word "offense" to limit post-conviction relief to prisoners who could show that they never actually committed the crime. *Van Tran v. State*, 66 S.W.3d at 820-22 (Barker, J., dissenting).

Subsequently, the United States Court of Appeals for the Fifth Circuit adopted a similar interpretation of the AEDPA's analogous language. *In re Webster*, 605 F.3d 256, 258-59 (5th Cir. 2010). The court held that

> [T]here is no reason to believe that Congress intended the language "guilty of the offense" to mean "eligible for a death sentence." Had Congress wanted the provision to cover challenges to a sentence – even if only to a death sentence – it easily could have referenced sentences explicitly in the text, as it did numerous times throughout § 2255. Or if Congress had

---

[16]Act of Apr. 26, 1995, ch. 207, § 1, 1995 Tenn. Pub. Acts 305, 305.

intended to signal courts to incorporate the old, broad interpretation of actual innocence, it well could have used the words, "actual innocence." Instead, it elected to couch § 2255(h)(1), as well as § 2244(b)(2)(B)(ii), in the markedly different, unmistakable terms of *guilt of the offense.* Absent some indication that Congress meant for the language in § 2255(h)(1) not to be taken literally, we decline to interpret it any other way.

*In re Webster*, 605 F.3d at 258-59 (footnotes omitted).[17]

We agree with Justice Barker that the same reasoning applies to Tennessee's statute. To qualify as "actually innocent" under Tenn. Code Ann. § 40-30-117(a)(2), a petitioner must "demonstrate actual innocence of the underlying crimes for which he was convicted." *Van Tran v. State*, 66 S.W.3d at 822 (Barker, J., dissenting).[18]

On this point, Mr. Keen raises an additional argument. He insists that the "offense" of which he was convicted and of which he is actually innocent is the "offense" of "capital murder." While this argument might have traction in other jurisdictions, in Tennessee, there is no separate offense known as "capital murder."[19] Tenn. Code Ann. § 39-13-202 defines

---

[17]Judge Jacques Wiener wrote separately in *In re Webster* "to emphasize the absurdity of its Kafkaesque result." If a jury was given the evidence of Mr. Webster's intellectual disability, Judge Wiener said, "it is virtually guaranteed" that he would be found intellectually disabled. However, "[b]ecause Webster seeks to demonstrate only that he is constitutionally ineligible for the death penalty – and not that he is factually innocent of the crime – we must sanction his execution." Because "Congress's instruction . . . ties our judicial hands so illogically, we today have no choice but to condone just such an unconstitutional punishment." *In re Webster*, 605 F.3d at 259-60 (Wiener, J., concurring).

[18]Additional evidence for this conclusion is found in the fact that Tenn. Code Ann. §§ 40-30-102(b)(3) and 40-30-117(a)(3) explicitly contemplate an inmate's attack on an erroneously enhanced "sentence." This language demonstrates that the General Assembly was fully capable of differentiating between sentences and offenses in the Post-Conviction Procedure Act. We are compelled to conclude that "actually innocent of the offense" means that one was never factually guilty of the crime.

[19]Several states recognize "capital murder" as a distinct offense. In Arkansas, Kansas and Virginia, "capital murder" is defined by statute as a separate offense with its own distinct elements. *See* Ark. Code Ann. § 5-10-101 (Lexis Supp. 2011); Kan. Stat. Ann. § 21-5401 (Supp. 2011); Va. Code Ann. § 18.2-31 (Supp. 2012). Mississippi and Texas recognize "capital murder," but the definition of the offense relies on the separately-enumerated elements of "murder." *See* Miss. Code Ann. § 97-3-19 (2006); Tex. Penal Code Ann. § 19.03 (West 2011). By contrast, the term "capital murder" appears nowhere in the Tennessee Code, and, while this Court sometimes speaks of "capital offenses" and "capital sentencing," we have generally avoided the phrase "capital murder."

"first degree murder,"[20] and Tenn. Code Ann. § 39-13-204 sets out the procedures for sentencing a defendant convicted of first degree murder. These statutes assign three possible sentences: imprisonment for life, imprisonment for life without the possibility of parole, and "punishment of death." Tenn. Code Ann. § 39-13-204(i) sets out the seventeen aggravating factors that authorize a jury to impose a sentence of death. It is clear from this statutory scheme that the underlying "offense" is "first degree murder," and that the death penalty is a sentencing consideration rather than an independent offense.

To reopen post-conviction proceedings under Tenn. Code Ann. § 40-30-117(a)(2), a petitioner must present scientific evidence that he is "actually innocent of the offense." Because we cannot apply any "forced or subtle construction" to distort the "natural and ordinary meaning" of the statute's "clear and unambiguous" language, *Eastman Chem. Co. v. Johnson*, 151 S.W.3d at 507, we find that "actually innocent of the offense" means nothing other than that the person did not commit the crime. Here, Mr. Keen pleaded guilty to the rape and "first degree murder" of Nikki Reed. His "offense" at issue is "first degree murder." He is not alleging factual innocence of that offense. Intellectual disability does not equate to actual innocence. Mr. Keen's cause cannot be heard on a motion to reopen under Tenn. Code Ann. § 40-30-117(a)(2).

Because we have determined that a claim alleging ineligibility for the death penalty does not qualify as an actual innocence claim under Tenn. Code Ann. § 40-30-117(a)(2), it is not necessary that we examine the issue of whether a recently obtained score from a recently renormed I.Q. test, such as the WAIS-IV, constitutes "new scientific evidence" under that subsection.

Mr. Keen asks us to remand his case for a new hearing on intellectual disability, just as we did for Michael Angelo Coleman and Leonard Smith. But Mr. Keen's circumstances are different. Messrs. Coleman and Smith were able to take advantage of the one-year

---

[20]First degree murder is:

(1) A premeditated and intentional killing of another;

(2) A killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, act of terrorism, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, aggravated child neglect, rape of a child, aggravated rape of a child or aircraft piracy; or

(3) A killing of another committed as the result of the unlawful throwing, placing or discharging of a destructive device or bomb.

Tenn. Code Ann. § 39-13-202(a).

window for reopening their petitions under *Van Tran* or *Atkins*. For whatever reason, Mr. Keen did not avail himself of that opportunity.

We remain committed to the principle that Tennessee has no business executing persons who are intellectually disabled. Our holding today is only that Tenn. Code Ann. § 40-30-117(a)(1) and (2) do not provide Mr. Keen with a vehicle to assert that he is intellectually disabled. Our decision does not foreclose any other remedy currently available to Mr. Keen. If he is indeed intellectually disabled, this issue deserves to be heard. Likewise, it does not foreclose the ability of the General Assembly to create a procedure that accommodates prisoners on death row whose intellectual disability claims cannot be raised under Tenn. Code Ann. § 40-30-117(a)(1) or (2).

## V.

We have determined that our holding in *Coleman v. State* did not establish a new constitutional right under Tenn. Code Ann. § 40-30-117(a)(1). Additionally, we have determined that the General Assembly, in crafting Tenn. Code Ann. § 40-30-117(a)(2), did not intend the words "actually innocent of the offense" to encompass ineligibility for the death penalty under Tenn. Code Ann. § 39-13-203. Therefore, we affirm the judgment of the post-conviction court and the Court of Criminal Appeals denying Mr. Keen's motion to reopen his post-conviction proceeding. Because Mr. Keen appears to be indigent, the costs of this appeal are assessed to the State of Tennessee.

 

_____
WILLIAM C. KOCH, JR., JUSTICE