IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs September 3, 2014

## VINCENT SIMS v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**No. P25898    Chris Craft, Judge**

---

**No. W2014-00166-CCA-R3-PD  - Filed December 23, 2014**

---

The Petitioner, Vincent Sims, appeals from the denial of his petition for writ of error coram nobis, in which he claimed he is intellectually disabled and, therefore, ineligible for the death penalty.  On appeal, the Petitioner contends that the trial court erred in denying his petition for writ of error coram nobis and his stand-alone claim under the intellectual disability provisions in Tennessee Code Annotated section 39-13-203.  We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the Court, in which ALAN E. GLENN and ROBERT W. WEDEMEYER, JJ., joined.

Robert L. Hutton, Memphis, Tennessee, for the appellant, Vincent Sims.

Robert E. Cooper, Jr., Attorney General & Reporter; James E. Gaylord, Senior Counsel; Amy P. Weirich, District Attorney General; and Stephen Jones, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

In May 1998, the Petitioner was convicted of especially aggravated burglary and first degree premeditated murder in connection with the shooting death of Forrest Smith.  The Petitioner received consecutive sentences of 25 years for especially aggravated burglary and death for first degree murder.  The jury found four aggravating circumstances in sentencing the Petitioner to death:  (1) the Petitioner was previously convicted of one or more felonies with statutory elements that involve the use of violence against the person; (2) the murder

was especially heinous, atrocious, or cruel; (3) the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the Petitioner or another; and (4) the murder was committed during the commission of a burglary or theft. See Tenn. Code Ann. § 39-13-204(i)(2), (5), (6), (7) (1997). The Tennessee Supreme Court affirmed the Petitioner's convictions and sentences on direct appeal. See State v. Sims, 45 S.W.3d 1, 5 (Tenn. 2001).

The evidence presented at trial was summarized by the Tennessee Supreme Court in its opinion on direct appeal as follows:

On April 5, 1996, Forrest Smith arrived home from work around 10:00 p.m. He found the [Petitioner], Vincent Sims, and Sims's cousin, Brian Mitchell, in the process of burglarizing his home. Mitchell testified that Sims had called him earlier in the evening asking for help in moving a big screen television from a house Sims had burglarized. Sims picked up Mitchell in a borrowed Toyota Camry belonging to Sims's girlfriend. They drove to Smith's house, parked the car under the carport, and loaded the big screen television in the trunk. Sims and Mitchell were in the house disconnecting a computer when Smith arrived. Smith parked his Jeep in the driveway to block the other vehicle's exit. When Smith entered the house, Sims and Mitchell ran outside but were unable to get the Camry out of the driveway. Sims went back into the house while Mitchell remained outside.

Mitchell testified that he heard Sims yelling at Smith to give Sims the keys to the Jeep. Mitchell then heard eight or nine gunshots fired inside the house. Sims returned carrying Smith's .380 caliber chrome pistol and the keys to the Jeep. Sims was holding his side and told Mitchell that he had been shot. Sims threw Mitchell the keys to move the Jeep, and the two fled the scene in the Camry. Mitchell testified that Sims told him that Sims and Smith had fought over the .380 caliber pistol and that Sims had shot Smith. Sims told Mitchell that Sims had to kill Smith because Smith had seen Sims's face. Sims instructed Mitchell not to talk to anyone about what had happened and later threatened Mitchell's life after they were in custody.

Smith's girlfriend, Patricia Henson, arrived at the home shortly after the shooting, sometime between 10:00 and 10:30 p.m. Smith was lying on the kitchen floor in a pool of blood, but he was conscious and asked Henson to call 911. When asked what had happened, Smith was able to tell Henson and Officer Donald Crowe that there had been a robbery and that Smith had been shot in the head. Officer Crowe testified that Smith was bleeding from several parts of his body, appeared to have been shot more than once, and was in

severe pain. After receiving treatment by paramedics on the scene, Smith was transported to the hospital. He died approximately four and a half hours later.

In the meantime, Sims took Mitchell home and picked up Sims's girlfriend, Tiffany Maxwell, from work after she clocked out at 11:05 p.m. Maxwell testified that Sims was visibly upset and had blood on his shirt. Upon inquiry, Sims told her that someone had attempted to rob him. Maxwell also noticed that he had a "deep scar" injury on his side, which she treated herself after Sims refused to go to the hospital. The following morning, Sims and Maxwell took Maxwell's car to be washed and detailed. Maxwell then noticed that the license plate frame on her car was broken. Sims and Maxwell attended an Easter Sunday church service the next morning. According to Maxwell, Sims behaved normally with nothing unusual occurring until the following Tuesday when Sims was arrested at Maxwell's place of employment.

After Sims and Mitchell were in custody, Sims gave Mitchell a letter to deliver to Mitchell's attorney. In that letter, Sims recalled the events surrounding the burglary and murder. Sims alleged that Smith had fired at Sims and Mitchell as they fled the house. Mitchell testified that this portion of the letter was untrue. Mitchell maintained that no shots were fired until Sims went back inside the house to get Smith's keys to the Jeep. Sims also contended in the letter that Smith was accidentally shot in the head while the two struggled over the .380 caliber pistol.

Significantly, however, the bullet removed from Smith's brain was a .22 caliber bullet. The police also recovered fragments from three or four .22 caliber bullets at the scene. Mitchell testified that he had seen Sims with a long barrel .22 caliber revolver with a brown handle earlier in the evening. Although Mitchell did not see Sims with the revolver during the burglary, he did see something protruding under Sims's shirt. In addition to the .22 caliber bullets, the police found a bullet fragment from a probable .380 caliber bullet and five fired .380 caliber cartridge cases at the scene. Officers also recovered from Smith's carport a beeper that was later identified as belonging to Sims and the broken license plate frame from Maxwell's car.

Forensic pathologist Wendy Gunther performed the autopsy on Smith. She testified that Smith suffered a gunshot entry and exit wound to his head. Part of the bullet entered Smith's brain and lodged in his skull above his right eye, and the other piece exited in front of his right ear. Smith also suffered multiple blows to his head, neck, shoulders, arms, sides, back, and buttocks.

The bruising indicated that Smith had been struck with a long, narrow, rod-shaped object at least a quarter inch wide. Dr. Gunther estimated that Smith had been struck at least ten times but probably many more. She stated that the blows were very hard as evidenced by the immediate bruising on Smith's body. Smith suffered at least six blows to his head, one of which fractured his skull at the back of his head. Dr. Steven Symes, a forensic anthropologist, opined that this head injury was inflicted after the gunshot wound to Smith's head. Although the gunshot wound to the head was the worst injury and would by itself have caused death, Dr. Gunther testified that the cause of death was a combination of all of the injuries.

Based upon the above evidence, the jury convicted Sims of especially aggravated burglary and first degree premeditated murder. Trial then proceeded to the penalty stage. The State presented evidence through Jennifer Gadd, an employee with the Criminal Court Clerk's Office, that Sims had two prior convictions for aggravated assault. The State also submitted all evidence from the guilt phase in support of its position in the penalty phase.

The defense presented five mitigation witnesses, Sims's mother, father, brother, and two aunts. These family members testified that Sims was a good child who never got into trouble until sometime in his teens. They also testified that Sims had close relationships with his family. One of his aunts, Mary Gardner, worked at the Shelby County Correctional Facility and testified that Sims was a model prisoner while incarcerated there. On cross-examination the State was allowed to question the mitigation witnesses regarding Sims's prior convictions for theft in 1990, aggravated assault in 1991, and aggravated burglary in 1993.

Sims, 45 S.W.3d at 5-7.

## POST-CONVICTION PROCEEDINGS

On November 15, 2001, the Petitioner filed a *pro se* petition for post-conviction relief. Following the appointment of counsel, the Petitioner filed an amended petition on August 8, 2002. The Petitioner did not raise a claim regarding intellectual disability.

In preparation for the post-conviction proceedings, Dr. Pamela Auble, a clinical neuropsychologist, evaluated the Petitioner in July 2002 and April 2003 and provided a report of her findings dated August 20, 2004. Dr. Auble testified regarding her findings during the post-conviction hearing on September 17, 2004.

In evaluating the Petitioner, Dr. Auble interviewed him, administered testing, and reviewed numerous records. These records included the transcript of testimony of other witnesses during the post-conviction hearing, school records, medical records, the Tennessee Supreme Court's opinion on direct appeal, the Petitioner's pre-sentence report, and a timeline. In both her report and during her testimony, Dr. Auble discussed the Petitioner's family history, medical history, educational history, achievement testing, history of alcohol and drug abuse, criminal history, and employment history.

Dr. Auble administered the Wechsler Adult Intelligence Scale-III test (WAIS-III) to the Petitioner. The Petitioner received a verbal I.Q. score of 72, a performance I.Q. score of 81, and a full scale I.Q. score of 75. In her report, Dr. Auble stated:

> Mr. Sims's Full Scale IQ of 75 would not meet current legal criteria for [intellectual disability] as defined by the Tennessee statute on [intellectual disability] (TCA 39-13-203). The Diagnostic and Statistical Manual of Mental Disorders (Fourth Edition, Text Revision) states that mild [intellectual disability] can be diagnosed with Full Scale Wechsler IQ's as high as 75 if there are concurrent adaptive deficits because there is a measurement error of five points on the scale. From the DSM-IV, deficits in at least two of ten areas of adaptive functioning are required (communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health and safety). Mr. Sims' language deficits, his impaired verbal memory, his limited verbal knowledge and reasoning, and his mental rigidity raise the possibility of deficits in several of these areas (for example, communication, social/interpersonal, self-direction).

During the post-conviction hearing, Dr. Auble also testified that the standard for intellectual disability pursuant to Tennessee statute differed from the standard set forth in other sources.

The Petitioner was also evaluated by Dr. George Woods, a neuropsychiatrist. Dr. Woods interviewed the Petitioner, administered testing, and reviewed many of the same records reviewed by Dr. Auble. Dr. Woods did not administer I.Q. testing but relied upon the results obtained by Dr. Auble.

Dr. Woods testified during post-conviction proceedings on September 17 and November 5, 2004. He stated that although the Petitioner's I.Q. score of 75 did not meet the

legal standards of intellectual disability, the score fell within the range of intellectual disability set forth by the American Association of Mental Retardation and the Diagnostic and Statistical Manual. Dr. Woods also stated that the Petitioner had brain impairments that were "greater than what a 75 IQ could predict."

On October 1, 2008, the post-conviction court entered an order denying post-conviction relief. This Court affirmed the post-conviction court's judgment on appeal. See Vincent Sims v. State, No. W2008-02823-CCA-R3-PD, 2011 WL 334285, at *1 (Tenn. Crim. App., Jan. 28, 2011), *perm. app. denied* (Tenn. Aug. 31, 2011).

## INTELLECTUAL DISABILITY PROCEEDINGS

On April 9, 2012, the Petitioner filed a motion to reopen post-conviction proceedings, alleging that he is intellectually disabled and, therefore, ineligible for the death penalty. The Petitioner contended that the Tennessee Supreme Court's decision in Coleman v. State, 341 S.W.3d 221 (Tenn. 2011), established a new constitutional right that was not recognized at the time of his trial. He further contended that he had new scientific evidence that he is intellectually disabled and, therefore, actually innocent of capital murder and the death penalty.

The Petitioner attached to his motion an affidavit from Dr. Auble dated April 5, 2012. Dr. Auble stated that she performed a neuropsychological evaluation on the Petitioner in 2002 and 2003. She said that in evaluating the Petitioner, she considered the results of testing that she administered, testimony from the post-conviction hearing, medical records, school records, the Tennessee Supreme Court's opinion on direct appeal, the Petitioner's pre-sentence report, and a timeline. Dr. Auble stated that at the time she conducted the evaluation, she understood that Tennessee courts required a raw test score of 70 or below before an expert could opine that an individual had significantly subaverage general intellectual functioning as provided in Tennessee Code Annotated section 39-13-203(a)(1).

Dr. Auble quoted from her 2004 report in which she stated the Petitioner's full scale I.Q. score of 75 on the WAIS-III would not meet the current legal criteria for intellectual disability as defined by Tennessee statute and the DSM-IV provided that intellectual disability could be diagnosed with a full scale score of 75 on the Wechsler tests because there is a measurement error of five points on the scale. Dr. Auble said that she understood that the Tennessee Supreme Court abandoned the "bright line requirements" of a raw test I.Q. score of 70 or below in Coleman. As a result, she re-analyzed the information that she had available in 2004 and supplemented it with additional information that she obtained in examining the Petitioner's adaptive deficits.

Dr. Auble adjusted the Petitioner's I.Q. score of 75 based upon the Flynn Effect and the errors in the normative sample on the WAIS-III. These adjustments resulted in a full scale I.Q. of 70.26. She also considered the five-point measurement error on the WAIS-III. Dr. Auble noted that the 95% confidence interval for an I.Q. test score of 70 would be 67-75 and that the 95% confidence interval for an I.Q. test score of 71 would be 68-76. Dr. Auble stated that intellectual disability can be diagnosed with intelligence test scores that are above 70 if the range of error of the test includes an I.Q. of 70 or below, and there is corollary evidence of other impairments in intelligent or adaptive functioning. She noted that in the Petitioner's case, there is evidence of significant adaptive deficits and significant deficits on tests measuring intelligent functioning. As a result, Dr. Auble opined that the Petitioner has significant subaverage general intellectual functioning as evidenced by a functional I.Q. of 70 or below and meets the first prong of intellectual disability set forth in the Tennessee statute.

Dr. Auble stated that in 2004, she did not conduct a formal evaluation of adaptive behavior deficits. She administered the Independent Living Scale to the Petitioner on March 19, 2012. Dr. Auble determined that the Petitioner had significant adaptive deficits under the DSM-IV criteria in the areas of communication, social/interpersonal skills, self-direction, and functional academic skills. She found that the Petitioner had mild impairments in home living, work, and health and safety. Dr. Auble determined that the Petitioner had significant adaptive deficits under the AAIDD criteria in the conceptual and social domains. She further determined that the Petitioner's intellectual impairments have been present since early childhood. Accordingly, Dr. Auble concluded the Petitioner met the criteria for intellectual disability provided in the Tennessee statute.

On December 20, 2012, the Tennessee Supreme Court released its opinion in Keen v. State, 398 S.W.3d 594 (Tenn. 2012), in which the court rejected the basis upon which the Petitioner sought to reopen his post-conviction proceedings. On December 27, 2012, the Petitioner amended his motion to include a petition for writ of error coram nobis and an independent claim of relief under Tennessee's intellectual disability statute. The State filed a response seeking summary dismissal.

Based upon the pleadings, the trial court entered an order denying relief. The trial court found that the basis upon which the Petitioner sought to reopen his post-conviction petition were precluded by Keen. With regard to the Petitioner's petition for writ of error coram nobis, the trial court found that the evidence presented in Dr. Auble's report was cumulative to the evidence presented by Dr. Auble and Dr. Woods during post-conviction proceedings. The trial court noted that Dr. Auble and Dr. Woods testified regarding the clinical practice of applying the standard error of measurement and the Flynn Effect and provided an opinion regarding the effect that the application of these practices might have

-7-

on their assessments of the Petitioner's overall functioning. The trial court found that based upon their testimony, it is clear that the standard error of measurement and the Flynn Effect were part of the "neuropsychological parlance and practice" at the time of the post-conviction hearing. The trial court noted both experts expressed an opinion regarding the Petitioner's I.Q. in light of these factors and an opinion indicating that the Petitioner likely suffered from adaptive deficits.

The trial court found that although it did not appear that specific testing for adaptive deficits was conducted to verify the doctors' conclusions, the Petitioner and post-conviction counsel were aware that such deficits likely existed and chose not to pursue further testing to confirm the presence of the deficits. The trial court further found that the evidence which the Petitioner claims demonstrates his intellectual disability was available to counsel at the time of his post-conviction hearing. The trial court concluded that the Petitioner was not entitled to relief based upon newly discovered evidence because the evidence was not "newly discovered."

The trial court also found the Petitioner's claim was barred by the one-year statute of limitations. The trial court noted that the information related to the potential issue of intellectual disability had been available for many years. The trial court further noted that "[m]erely having an expert re-evaluate previous testing or conduct additional testing when previous evaluations had been done in the past does not satisfy the criteria for tolling the statute."

The Petitioner filed a notice of appeal of the denial of his coram nobis petition and claim for relief under the Tennessee intellectual disability statute, pursuant to Rule 3 of the Tennessee Rules of Appellate Procedure. He also filed an application for permission to appeal the trial court's denial of his motion to reopen his post-conviction petition, pursuant to Supreme Court Rule 28. On February 5, 2014, this Court entered an order denying the Petitioner's application for permission to appeal, concluding that the claims in his motion to reopen were precluded by Keen. See Vincent Sims v. State, No. W2013-02594-CCA-R28-PD (Tenn. Crim. App. Feb. 5, 2014) (order). The Tennessee Supreme Court denied the Petitioner's application for permission to appeal on May 28, 2014. This current appeal concerns the trial court's denial of coram nobis relief and the Petitioner's claim under Tennessee's intellectual disability statute.

**ANALYSIS**

The Petitioner contends that the trial court erred in denying his petition for writ of error coram nobis in which he claimed he is intellectually disabled and, therefore, ineligible for the death penalty. He also contends he should be allowed to directly invoke the

provisions of Tennessee Code Annotated section 39-13-203 to establish that he is intellectually disabled.

## A. Intellectual Disability and the Death Penalty

Enacted in 1990, Tennessee Code Annotated section 39-13-203 prohibits the execution of defendants who were intellectually disabled at the time that they committed first degree murder. See Tenn. Code Ann. § 39-13-203(b); State v. Howell, 151 S.W.3d 450, 455 (Tenn. 2004); State v. Van Tran, 66 S.W.3d 790 (Tenn. 2001). Although the statute is not to be applied retroactively, the execution of intellectually disabled individuals violates constitutional prohibitions against cruel and unusual punishment. Howell, 151 S.W.3d at 455 (citing Van Tran, 66 S.W.3d at 798-99); see Atkins v. Virginia, 536 U.S. 304, 321 (2002).

In Tennessee, "intellectual disability" rendering a defendant ineligible for the death penalty requires:

> (1) Significantly subaverage general intellectual functioning as evidenced by a functional intelligent quotient (I.Q.) of seventy (70) or below;
>
> (2) Deficits in adaptive behavior; and
>
> (3) The intellectual disability must have manifested during the developmental period, or by eighteen (18) years of age.

Tenn. Code Ann. § 39-13-203(a). All three prongs must be satisfied to establish intellectual disability.


The defendant has the burden of establishing intellectual disability by a preponderance of the evidence. See Tenn Code Ann. § 39-13-203(c); Howell, 151 S.W.3d at 465. The issue of whether a defendant is intellectually disabled and, thus, ineligible for the death penalty is a mixed question of law and fact. State v. Strode, 232 S.W.3d 1, 8 (Tenn. 2007). A trial court's findings of fact are binding on this Court unless the evidence preponderates against those findings. Id. The trial court's application of the law to those facts is reviewed *de novo*. Id.

The first prong of intellectual disability under section 39-13-203(a)(1) requires "[s]ignificantly subaverage general intellectual functioning as evidenced by a functional intelligent quotient (I.Q.) of seventy (70) or below." In applying this provision, the

Tennessee Supreme Court held in Howell that the demarcation of an I.Q. of 70 was a "bright-line" rule that must be met. Howell, 151 S.W.3d at 456-59. Following Howell, the Tennessee Supreme Court released its opinion in Coleman v. State, 341 S.W.3d 221, 241 (Tenn. 2011), holding that although an individual's I.Q. is generally obtained through standardized intelligence tests, section 39-13-203 does not provide clear direction regarding how an I.Q. should be determined and does not specify any particular test or testing method that should be utilized. The court noted section 39-13-203(a)(1) requires a "functional intelligence quotient of seventy (70) or below" and does not require a "functional intelligence quotient *test score* of seventy (70) or below." Coleman, 341 S.W.3d at 241 (emphasis in original). Therefore, "the trial courts may receive and consider any relevant and admissible evidence regarding whether the defendant's functional I.Q. at the time of the offense was seventy (70) or below." Id.

Our supreme court noted that section 39-13-203(a)(1) differs with clinical practice in one material respect. Id. at 247. In diagnosing intellectual disability, clinicians generally report their conclusions regarding an individual's I.Q. within a range, whereas section 39-13-201(a)(1) requires more definite testimony. Id. As a result, "an expert's opinion regarding a criminal defendant's I.Q. cannot be expressed within a range (i.e., that the defendant's I.Q. falls somewhere between 65 to 75) but must be expressed specifically (i.e., that the defendant's I.Q. is 75 or is 'seventy (70) or below' or is above 70)." Id. at 242.

In determining whether a defendant's functional I.Q. is 70 or below, "a trial court should consider all evidence that is admissible under the rules for expert testimony." Keen, 398 S.W.3d at 605. Experts may use relevant and reliable practices, methods, standards, and data in formulating their opinions. Coleman, 341 S.W.3d at 242. Moreover,

> if the trial court determines that professionals who assess a person's I.Q. customarily consider a particular test's standard error of measurement, the Flynn Effect, the practice effect, or other factors affecting the accuracy, reliability, or fairness of the instrument or instruments used to assess or measure the defendant's I.Q., an expert should be permitted to base his or her assessment of the defendant's "functional intelligence quotient" on a consideration of those factors.

Id. at n.55. The emphasis to be placed upon clinical judgment varies depending upon "the type and amount of information available, the complexity of the issue, and the presence of one or more challenging conditions or situations." Id. at 246. The trial court is not required to follow any particular expert's opinion but must fully and fairly consider all evidence presented, including the results of all I.Q. tests administered to the defendant. Id. at 242.

Following Coleman, the Tennessee Supreme Court released its opinion in Keen v. State, 398 S.W.3d 594 (Tenn. 2012), addressing the issue of whether a capital petitioner may allege intellectual disability as a basis for reopening post-conviction proceedings. The petitioner in Keen sought to reopen post-conviction proceedings on the ground that he possessed new scientific evidence of actual innocence. Keen, 398 S.W.3d at 598. The evidence consisted of a newly-obtained I.Q. score of 67, which the petitioner claimed established he was intellectually disabled and, therefore, "'actually innocent' of the offense of first degree murder." Id. The petitioner also asserted that Coleman established a new rule of constitutional criminal law that required retroactive application. Id. at 599. The Tennessee Supreme Court rejected both of the basis upon which the petitioner sought to reopen post-conviction proceedings. The court specifically held that Coleman addressed the interpretation and application of Tennessee Code Annotated section 39-13-203 and was not a constitutional ruling. Id. at 609. The court further held that "a claim alleging ineligibility for the death penalty does not qualify as an actual innocence claim." Id. at 613. While remaining "committed to the principle that Tennessee has no business executing persons who are intellectually disabled," the court held that the petitioner failed to meet the requirements for reopening post-conviction proceedings. Id.

In addressing its holdings in Howell and Coleman, the court noted:

> Regrettably, several courts misconstrued our holding in Howell that Tenn. Code Ann. § 39-13-203(a)(1) established a "bright line rule" for determining intellectual disability. They understood this language to mean that courts could consider *only* raw I.Q. scores. Accordingly, these courts tended to disregard any evidence suggesting that raw scores could paint an inaccurate picture of a defendant's actual intellectual functioning. This was an inaccurate reading of Howell, in which we took pains to say that the trial court should "giv[e] full and fair consideration to all tests administered to the petitioner" and should "fully analyz[e] and consider[] all evidence presented" concerning the petitioner's I.Q.

Id. at 603 (citations omitted) (emphasis in original). The petitioner requested that the court remand his case for a new hearing on the issue of intellectual disability, just as the court had done in Coleman and in Smith v. State. See Smith v. State, 357 S.W.3d 322, 354-55 (Tenn. 2011); Coleman, 341 S.W.3d at 252-53. The court in Keen, however, rejected the petitioner's contention, noting that Coleman and Smith took advantage of the one-year window for reopening their petitions following the recognition of the constitutional prohibition against executing intellectually disabled defendants in Van Tran and Atkins.

<u>Keen</u>, 398 S.W.3d at 613. The petitioner in <u>Keen</u> failed to avail himself of that opportunity. <u>Id.</u>

## B. Writ of Error Coram Nobis

A writ of error coram nobis is an "extraordinary procedural remedy," filling only a "slight gap into which few cases fall." <u>State v. Mixon</u>, 983 S.W.2d 661, 672 (Tenn. 1999) (citation omitted). Tennessee Code Annotated section 40-26-105(b) provides that coram nobis relief is available in criminal cases as follows:

> The relief obtainable by this proceeding shall be confined to errors dehors the record and to matters that were not or could not have been litigated on the trial of the case, on a motion for a new trial, on appeal in the nature of a writ of error, on writ of error, or in a habeas corpus proceeding. Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial.

Unlike the grounds for reopening a post-conviction petition, the grounds for seeking a petition for writ of error coram nobis are not limited to specific categories. <u>Harris v. State</u>, 102 S.W.3d 587, 592 (Tenn. 2003). Coram nobis claims may be based upon any "newly discovered evidence relating to matters litigated at the trial" so long as the petitioner establishes that he or she was "without fault" in failing to present the evidence at the proper time. <u>Id.</u> Coram nobis claims are "singularly fact-intensive," are not easily resolved on the face of the petition, and often require a hearing. <u>Id.</u> at 592-93. In a coram nobis proceeding, the trial judge must first consider the newly discovered evidence and be "reasonably well satisfied" with its veracity. <u>State v. Vasques</u>, 221 S.W.3d 514, 527 (Tenn. 2007). If the defendant is "without fault" in the sense that the exercise of reasonable diligence would not have led to a timely discovery of the new information, the trial judge must then consider both the evidence at trial and that offered at the coram nobis proceeding in order to determine whether the new evidence may have led to a different result. <u>Id.</u> The decision to grant or deny coram nobis relief rests within the sound discretion of the trial court. <u>Id.</u> at 527-28.

The State asserts that the Petitioner's claim is barred by the statute of limitations. Coram nobis claims are subject to a one-year statute of limitations. Tenn. Code Ann. § 27-7-103. The statute of limitations is computed "from the date the judgment of the trial court

becomes final, either thirty days after its entry in the trial court if no post-trial motions are filed or upon entry of an order disposing of a timely filed, post-trial motion." Harris v. State, 301 S.W.3d 141, 144 (Tenn. 2010). The issue of whether a claim is barred by an applicable statute of limitations is a question of law, which this Court reviews *de novo*. See id. We must construe the coram nobis statute of limitations "consistent with the longstanding rule that persons seeking relief under the writ must exercise due diligence in presenting the claim." Id.

The one-year statute of limitations may be tolled on due process grounds if the petitioner seeks relief based upon newly discovered evidence of actual innocence. Wilson v. State, 367 S.W.3d 229, 234 (Tenn. 2012). In determining whether tolling is proper, the court must balance the petitioner's interest in having a hearing with the State's interest in preventing a claim that is stale and groundless. Harris, 301 S.W.3d at 145 (citing Workman v. State, 41 S.W.3d 100, 102 (Tenn. 2001)). Generally, "before a state may terminate a claim for failure to comply with . . . statutes of limitations, due process requires that potential litigants be provided an opportunity for the presentation of claims at a meaningful time and in a meaningful manner." Burford v. State, 845 S.W.2d 204, 208 (Tenn. 1992). The Burford rule consists of three steps:

> (1) determine when the limitations period would normally have begun to run; (2) determine whether the grounds for relief actually arose after the limitations period would normally have commenced; and (3) if the grounds are "later-arising," determine if, under the facts of the case, a strict application of the limitations period would effectively deny the petitioner a reasonable opportunity to present the claim.

Sands v. State, 903 S.W.2d 297, 301 (Tenn. 1995).

In this case, the limitations period would have begun to run 30 days after the entry of the order denying the Petitioner's motion for new trial from his 1998 convictions. The statute of limitations would have expired in 1999. Clearly, the petition was untimely, filed approximately 13 years later in on December 27, 2012.

The Petitioner contends, however, that he is entitled to due process tolling. He asserts that Dr. Auble's report is "newly available" evidence or evidence that did not become available for presentation until after the trial concluded. While the Petitioner acknowledges that his intellectual disability existed before trial, he argues that circumstances beyond his control prevented him from presenting such evidence. He submits that his intellectual disability first became available for presentation following our supreme court's opinion in Coleman.

Generally, to qualify as newly discovered evidence, the evidence must not have been known to the defendant at the time of trial. Wlodarz v. State, 361 S.W.3d 490, 506 (Tenn. 2012). However, a narrow exception exists where "'although not newly discovered evidence, in the usual sense of the term,'" the "'*availability*'" of the evidence "'is newly discovered.'" Harris, 301 S.W.3d at 160-61 (Koch, J., concurring) (quoting Taylor v. State, 171 S.W.2d 403, 405 (Tenn. 1943)); see David G. Housler, Jr. v. State, No. M2010-02183-CCA-R3-PC, 2013 WL 5232344, at *44 (Tenn. Crim. App. Sept. 17, 2013).

Courts have applied this narrow exception where previously unavailable evidence became available following a change in factual circumstances. See, e.g., Taylor, 171 S.W.2d at 405 (applying the exception when at the time of trial, one witness was hospitalized and one witness was working outside the state, and they later became available to testify); Misty Jane Brunelle v. State, No. E2010-00662-CCA-R3-PC, 2011 WL 2436545, at *10 (Tenn. Crim. App. June 16, 2011), *perm. app. denied* (Tenn. Oct. 18, 2011) (noting that the petitioner should have sought coram nobis relief when a DCS report that was known to the petitioner but sealed at the time of trial later became available). Many of these cases involve testimony of a co-defendant or a witness who previously refused to testify by asserting the constitutional privilege against self-incrimination. See, e.g., David G. Housler, Jr., 2013 WL 5232344, at *44; United States v. Guillette, 404 F.Supp. 1360, 1372-74 (D. Conn. 1975); Brantley v. State, 912 So.2d 342, 343 (Fla. App. 2005); State v. Williams, 246 So.2d 4, 6 (La. 1971); Commonwealth v. Brown, 431 A.2d 343, 344 (Pa. Super. Ct. 1981); State v. Gerdes, 258 N.W.2d 839, 843 (S.D. 1977).

The Petitioner has failed to cite to any authority applying this narrow unavailability exception based upon a change in the law. Issues regarding whether a change in the law should apply post-trial relate to retroactivity and are more properly addressed in post-conviction proceedings or a motion to reopen post-conviction proceedings. Even if the unavailability exception applies to a change in law, the Petitioner is not entitled to relief.

The Petitioner argues that following Howell and prior to Coleman, courts only could consider raw I.Q. scores in determining intellectual disability pursuant to Tennessee Code Annotated section 39-13-203(a)(1). We note that the Tennessee Supreme Court's opinion in Howell was released on November 16, 2004. Dr. Auble's initial report was dated August 20, 2004, and she testified during post-conviction proceedings on September 17, 2004. Dr. Woods testified on September 17 and November 5, 2004. Thus, Dr. Auble and Dr. Woods reached their opinion regarding the issue of intellectual disability prior to the release of Howell. Accordingly, the Petitioner cannot rely upon the holding in Howell in claiming that his mental health experts were limited in the information that they could consider in determining whether the Petitioner is intellectually disabled.

-14-

Moreover, the Tennessee Supreme Court in <u>Keen</u> stated that <u>Howell</u> did not provide for such a limitation. <u>Keen</u>, 398 S.W.3d at 603. Rather, the court in <u>Howell</u> instructed trial courts to "'giv[e] full and fair consideration to all tests administered to the petitioner'" and to "'fully analyz[e] and consider[] all evidence presented'" concerning the petitioner's I.Q. <u>Id.</u> (quoting <u>Howell</u>, 151 S.W.3d at 459).

The Tennessee Supreme Court noted in <u>Coleman</u> that its review of all cases involving the application of section 39-13-203 reflected that "the parties and the courts have not been limiting their consideration of whether a criminal defendant has a 'functional intelligence quotient of seventy (70) of below' to the defendant's raw I.Q. test scores." <u>Coleman</u>, 341 S.W.3d at 247. The court explained:

> For example, in *Cribbs v. State*, both the State and Mr. Cribbs presented evidence that his raw I.Q. test scores did not accurately reflect his actual I.Q. On behalf of the State, Dr. Wyatt Nichols stated that Mr. Cribbs's intellectual level was actually higher than the I.Q. test score of 73 and was "[m]ore like the mid to high 80s." *Cribbs v. State*, 2009 WL 1905454, at *22, 32. Dr. Pamela Auble, appearing for Mr. Cribbs, stated in her initial report that his I.Q. was between 71 and 84. *Cribbs v. State*, 2009 WL 1905454, at *17. However, Dr. Auble later revised her opinion based on information obtained after her first report and concluded that Mr. Cribbs's I.Q. was below seventy. *Cribbs v. State*, 2009 WL 1905454, at *17. Based on all the evidence, the trial court concluded that the I.Q. test that produced the score of 73 was the most reliable. The trial court found that Dr. Auble's explanation for the change in her opinion was not credible and that Dr. Nichols's testimony was persuasive. *Cribbs v. State*, 2009 WL 1905454, at *32.

> The consideration of I.Q. test scores in *Cribbs v. State* is but one example of cases in which the State has argued and presented evidence that scores on I.Q. tests should not be considered on their face value. *See also State v. Strode*, 232 S.W.3d at 5 (the State presented evidence challenging the score on the basis that the defendant had been malingering); *Smith v. State*, 2010 WL 3638033, at *30 (the State presented evidence that the defendant's I.Q. test score should be discounted because of malingering); *Van Tran v. State*, 2006 WL 3327828, at 4-6 (the State argued that the Vietnamese-born defendant's low I.Q. test score reflected cultural and linguistic bias).

Id. The Tennessee Supreme Court concluded that these cases reflected "the parties' and the courts' existing awareness that, as a practical matter, a criminal defendant's 'functional intelligence quotient' cannot be ascertained based only on raw I.Q. scores." Id. The court further concluded that the cases also reflected "the parties' conclusion that Tenn. Code Ann. § 39-13-203(a) does not prevent them from presenting relevant and competent evidence, other than the defendant's raw I.Q. test scores, either to prove or to disprove that the defendant's 'functional intelligence quotient' when the crime was committed was 'seventy (70) or below.'" Id. at 247-48.

The Petitioner asserts that this Court has recognized that the legal standard for establishing intellectual disability following Coleman is different from the legal standard prior to Coleman. This Court, however, has rejected this argument. See Dennis Wade Suttles v. State, No. E2013-01016-CCA-R3-PD, 2014 WL 2902271, at *16-17 (Tenn. Crim. App. June 25, 2014). Rather, the Tennessee Supreme Court specifically held in Keen that Howell did not limit a court's determination of a defendant's I.Q. to raw I.Q. scores, and this holding in Keen controls.

We note that recently in Hall v. Florida, 134 S.Ct. 1986 (2014), the United States Supreme Court held that Florida courts' interpretation of the significantly subaverage intellectual functioning provision in Florida's intellectual disability statute is unconstitutional. Florida courts interpreted the statute as requiring a strict I.Q. raw test score of 70 without consideration of the standard error of measurement. Hall, 134 S.Ct. at 1992. The Supreme Court agreed "with medical experts that when a defendant's I.Q. test score falls within the test's acknowledged and inherent margin of error, the defendant must be able to present additional evidence of intellectual disability, including testimony regarding adaptive deficits." Id. at 2001. Unlike the defendant in Hall, however, the Petitioner has not been precluded during his original trial or during post-conviction proceedings from presenting evidence, other than his raw I.Q. test scores, to establish that his "functional intelligence quotient" when he committed the murder was 70 or below.

Contrary to the Petitioner's claims, the information in Dr. Auble's affidavit was available for presentation prior to Coleman. Nothing prevented the Petitioner from presenting during post-conviction proceedings relevant and competent evidence, other than his raw I.Q. test scores, to prove that his "functional intelligence quotient" when the crime was committed was "seventy (70) or below."

Almost eight years after Dr. Auble testified, the Petitioner filed his petition seeking to present testimony from the same expert. The information upon which Dr. Auble relied was available to the Petitioner at the time of the trial and the post-conviction hearing. Dr.

Auble relied upon the results of the I.Q. test she administered to the Petitioner in preparation of post-conviction proceedings. Nothing prevented Dr. Auble from administering the Independent Living Scale to the Petitioner prior to the post-conviction proceedings. The new testing in 2012 is merely cumulative to the evidence previously available to the Petitioner. See Wlodarz, 361 S.W.3d at 499 (noting that newly discovered evidence that is merely cumulative does not warrant the issuance of a writ). Because the Petitioner's claim could have been litigated at trial or during post-conviction proceedings, the grounds are not "later-arising" and do not justify the tolling of the one-year statute of limitations. See Tenn. Code Ann. § 40-26-105(b) (confining coram nobis relief to "matters that were not or could not have been litigated on the trial of the case, on a motion for a new trial, on appeal in the nature of a writ of error, on writ of error, or in a habeas corpus proceeding" and requiring the defendant to show that he was without fault in failing to present the evidence at the proper time).

Even if Coleman provided new grounds for relief, the Petitioner did not file his petition for writ of error coram nobis until 20 months following the issuance of Coleman. The Petitioner asserts that the coram nobis petition should relate back to his motion to reopen his post-conviction petition filed in April 2012. "No statute in Tennessee nor tolling rule developed at common law provides that the time for filing a cause of action is tolled during the period in which a litigant pursues a related but independent cause of action." Harris, 301 S.W.3d at 146. When the Petitioner filed his motion to reopen, he chose not to file a petition for writ of error coram nobis. It was not until after our supreme court released its opinion in Keen, rejecting the basis upon which the Petitioner relied in filing his motion to reopen, that the Petitioner filed a petition for writ of error coram nobis. A petitioner may not delay presenting a coram nobis claim until "every other avenue of relief ha[s] been exhausted." Billy Ray Irick v. State, No. E2010-02385-CCA-R3-PD, 2011 WL 1991671, at *18 (Tenn. Crim. App.May 23, 2011), *perm. app. denied* (Tenn. Aug. 25, 2011). Therefore, we conclude that under the circumstances of this case, the delay in seeking coram nobis relief is unreasonable.

We hold that the trial court properly found that the instant petition was barred by the one-year statute of limitations. Accordingly, the Petitioner is not entitled to coram nobis relief.

### C. Intellectual Disability Statute

The Petitioner asserts that the intellectual disability provisions in Tennessee Code Annotated section 39-13-203 provide an independent cause of action allowing him to challenge his eligibility for the death penalty. In construing a statute, we must ascertain and give effect to the legislative intent without unduly restricting or expanding a statute's

coverage beyond its intended scope. State v. Strode, 232 S.W.3d 1, 9 (Tenn. 2007).  We must give the words in the statute their natural and ordinary meaning in light of their statutory context.  Keen, 398 S.W.3d at 610.  We must avoid any "forced or subtle construction that would limit or extend the meaning of the language." Id. (citation omitted). "If the statutory language is clear and unambiguous, we apply the statute's plain language in its normal and accepted use." Id.

Tennessee Code Annotated section 39-13-203 lists the requirements of intellectual disability, the burden of proof, and the procedure when the issue is raised at trial.  The plain language of the statute does not create an independent cause of action allowing a defendant to challenge his or her eligibility for the death penalty.  Had the General Assembly intended to create a separate and independent cause of action in which to allege intellectual disability, they would have stated so in the statute.  See, e.g., Tenn Code Ann. § 40-30-301, *et. al.* (creating a cause of action to allow certain defendants to request DNA testing of evidence).  The Petitioner is not entitled to relief with regard to this issue.

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the trial court.

_____
ROBERT L. HOLLOWAY, JR., JUDGE