IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 4, 2024 at Jackson

**MORRIS JASON PEPPER v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Lincoln County**
**No. S9900118    Forest A. Durard, Jr., Judge**

———————————

**No. M2023-00785-CCA-R3-PC**

———————————

The Petitioner, Morris Jason Pepper, was convicted of first degree premeditated murder in 2000 and was sentenced to life imprisonment. In 2022, the Petitioner, with the assistance of counsel, filed a motion to reopen his petition for post-conviction relief, arguing that new scientific evidence established his actual innocence, referencing issues of inconsistent testimony, chain of custody, and the existence of alibi witnesses. He simultaneously filed a petition requesting touch DNA analysis of the several shotgun shells found at the murder scene and in the front yard of his home for the possible presence of either canine DNA or his codefendant's DNA, contending that analysis was pertinent to answer the question of who or what might have touched the shells. A hearing was held on the Petitioner's motion to reopen and his DNA petition, following which the post-conviction court denied relief in a single order. The Petitioner now appeals that decision, and he also requests relief via the doctrine of plain error due to the possible existence of a recording of his police interview and due to the destruction of evidence. Following our review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

KYLE A. HIXSON, J., delivered the opinion of the court, in which TIMOTHY L. EASTER and J. ROSS DYER, JJ., joined.

Nicolas W. Utter, Fayetteville, Tennessee, for the appellant, Morris Jason Pepper.

Jonathan Skrmetti, Attorney General and Reporter; William C. Lundy, Assistant Attorney General; Robert J. Carter, District Attorney General; and Amber Sandoval, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## I.      FACTUAL AND PROCEDURAL HISTORY

### A.      Trial and Direct Appeal Proceedings

As set forth by this court in its opinion on direct appeal, the proof presented during the trial proceedings reflected that on November 22, 1998, Willie Summers, the Petitioner's codefendant, and Jamie Briggs, the victim, were at Summers' house in Huntsville, Alabama. *State v. Pepper*, No. M2000-00883-CCA-R3-CD, 2001 WL 1094938, at *1 (Tenn. Crim. App. Sept. 19, 2001), *perm. app. denied* (Tenn. Mar. 4, 2002). The Petitioner subsequently arrived at the house with a shotgun wrapped in a sheet, but Summers' mother refused to let the Petitioner enter the house with the weapon. *Id.* The Petitioner placed the shotgun in Summers' car, and the three men went for drive. *Id.*

The trio drove around Huntsville looking for a Jeep Grand Cherokee to steal, but their search was unsuccessful. *Id.* The Petitioner claimed to know where to find car rims to steal, so he drove to that location on Carpenter Hollow Road in Taft, Tennessee. *Id.* Upon arrival, the Petitioner parked the car, obtained a screwdriver from the glove compartment, and announced that he and the victim would retrieve the rims. *Id.* Before the two men walked out of sight, Summers observed the Petitioner remove something from the trunk of the car and the victim pull a ski mask that he was wearing down over his face. *Id.*

A short time later, Summers heard four to six gunshots and the victim scream. *Id.* The Petitioner returned alone, carrying a shotgun, and said to Summers that he "killed that punk son of a b----." *Id.* Summers and the Petitioner left the area and drove to the Petitioner's house, where Summers observed the Petitioner hiding the shotgun under the hood of an old truck in the yard. *Id.*

The next morning the victim's body was discovered. *Id.* It was determined that the victim died as the result of five gunshot wounds inflicted by a twelve-gauge shotgun. *Id.* at *5. Six spent twelve-gauge shotgun shells were discovered at the crime scene off Carpenter Hollow Road where the victim was murdered. *Id.* Those shells were of two brands—three were Estate brand, and three were Winchester brand. *Id.*

Investigator Douglas Boeringer of the Lincoln County Sheriff's Department, after speaking with several individuals, learned that the Petitioner was one of the last people to see the victim alive. *Id.* at *2. On November 24, 1998, Investigator Boeringer went to

Huntsville, Alabama, and enlisted the assistance of Sergeant Charles Berry of the Madison County Sheriff's Department to accompany him to speak with the Petitioner. *Id.* Investigator Boeringer and Sgt. Berry went to the Petitioner's residence in Harvest, Alabama, arriving around 8:30 p.m. *Id.*

Both officers testified that they walked in the straightest line possible to the front door of the residence. *Id.* Once at the residence, the officers encountered the Petitioner's father who told them that the Petitioner was not home. *Id.* at *2. The officers left a business card with the Petitioner's father and asked him to instruct the Petitioner to call them as soon as possible when he returned. *Id.* The officers indicated that they walked the same path back to the police vehicle that they had used to get to the front door. *Id.* Sgt. Berry testified, "As I left the front door, walking back to the patrol vehicle, I happened to glance down and observed a fired, red in color, shotgun shell casing, which I picked up." *Id.* Sgt. Berry explained that the spent red shotgun shell appeared identical to the ones he had observed in photographs of the crime scene. *Id.* Sgt. Berry secured the spent shotgun shell and gave it to Investigator Boeringer once he was inside the patrol vehicle. The spent shotgun shell discovered at the Petitioner's residence by Sgt. Berry was an Estate brand shell. *Id.* at *5.

Subsequently, Investigator Boeringer, while still in Alabama, interviewed the Petitioner at the Madison County Sheriff's Department. After the Petitioner's interview had concluded, Investigator Boeringer, upon exiting the interview room, overheard the Petitioner admit to killing the victim, though he claimed to have done so in self-defense.

A Tennessee Bureau of Investigation ("TBI") forensic firearms identification expert testified at trial that the six spent shotgun shells found at the scene of the murder and the Estate shell found at the Petitioner's residence were all fired from the same shotgun. *Id.*

Additionally, at trial, Summers asserted that, on the Thursday or Friday preceding the victim's murder on Sunday, the Petitioner said that he was going to kill the victim. *Id.* Summers' sister, Shirley Wright, testified that, on November 21, 1998, she drove the Petitioner to Larry's Pistol and Pawn. *Id.* Ms. Wright did not know what the Petitioner bought while inside the pawn shop, although he did mention to her that he needed to buy ammunition. *Id.* A clerk at Larry's Pistol and Pawn authenticated a document that indicated the Petitioner had bought a twelve-gauge shotgun from the pawn shop on November 21, 1998. *Id.*

A Lincoln County jury convicted the Petitioner of first degree premeditated murder, and the trial court sentenced him to life imprisonment. *Id.* at *1. The Petitioner filed a

direct appeal with this court, arguing that the evidence was insufficient to sustain his conviction and that the trial court wrongly admitted the fired shotgun shell found in his yard after the murder.[1] *Id.* Following our review, this court affirmed the judgment of the trial court. *Id.* at *6.

### B. Previous Post-Conviction Proceedings

Thereafter, the Petitioner filed a pro se petition for post-conviction relief, alleging ineffective assistance of counsel among other grounds. *See Pepper v. State*, 2004 WL 2853429, at *1 (Tenn. Crim. App. Dec. 10, 2004), *perm. app. denied* (Tenn. Mar. 21, 2005). The Petitioner also filed a second petition pro se. *Id.* Then, counsel was appointed for the Petitioner, and an amended petition was filed. *Id.* In the record on appeal, there is only a copy of a pro se petition for post-conviction relief filed on April 29, 2003. Concurrently with the April 29, 2003 filing, the Petitioner filed a separate pro se petition for "forensic DNA analysis." In that prior DNA petition, the Petitioner specifically requested testing of "all human biological evidence in the possession or control of the prosecution, law enforcement, laboratory, or court which relate[d] to the investigation and prosecution" in this case. No other petitions appear in the record.

A post-conviction hearing was conducted on August 22, 2003. *Id.* The majority of the testimony at this hearing centered on trial counsel's failure to present a potential alibi witness, Sue Eady. There was neither testimony nor argument presented regarding the Petitioner's request for DNA analysis. However, other topics pertinent to this appeal were addressed.

At that hearing, post-conviction counsel questioned trial counsel about the spent shotgun shell found in the Petitioner's front yard, in part, as follows:

Q. And of all of those shotgun shells found down at the residence, all of those were suppressed, save one; isn't that right?

A. Yes, sir.

Q. And that was the one, as I recall, that the dog brought around the house.

A. I think that is correct.

---

[1] Based upon issues with the search warrant, all of the items found inside the Petitioner's residence, including a twelve-gauge shotgun, were suppressed. However, the six spent shotgun shells found at the scene of the murder and the one found in the Petitioner's front yard were admitted.

Also, post-conviction counsel asked trial counsel about the Petitioner's police interview:

> Q. Now, at one point in time, when [the Petitioner] was being interrogated by the Lincoln County [S]heriff's [D]epartment—I believe it was [Investigator] Boeringer, where he denied any knowledge of any of this, right?
>
> A. That's correct.
>
> Q. As Boeringer got up and started out, [the Petitioner] hollered at him and said, "Come back." He said, "What if it is self-defense?"
>
> A. That's correct.

Following the conclusion of the proof, the post-conviction court made oral rulings on several of the Petitioner's issues. The petition was subsequently denied by written order on September 2, 2003. *Id.* No order from the post-conviction court denying relief is included in the record on appeal. The Petitioner then appealed the denial of relief to this court, arguing only that his attorney's failure to present testimony from the alibi witness, in addition to other witnesses, constituted ineffective assistance of counsel. *Id.* at *4. This court affirmed. *Id.* at *6.

### C.      Current Post-Conviction Proceedings

On March 28, 2022, the Petitioner filed a pro se petition requesting DNA analysis pursuant Tennessee Code Annotated section 40-30-303. Specifically, he requested analysis of the spent shotgun shells found at the scene of the murder and of the spent shotgun shell found at his residence for "touch DNA skin cells" comparison. He also raised further ineffective assistance of counsel claims.

The State filed a response to the petition, noting that the trial court clerk had searched the Petitioner's file looking for the shotgun shells, but they were not found. The State further indicated that it had asked the Lincoln County Sheriff's Department to see if any trial exhibits were transferred to its custody following trial but that the sheriff's office did not find any trial exhibits in its possession. The State also maintained that, even if the shotgun shells were still in existence, there was no indication that after twenty years, they would retain any form of "touch DNA" if it were ever present at all. The State averred that

touch "DNA cannot be recovered from fired cartridge cases due to the extreme temperature" that occurs when a round is fired.

Ultimately, counsel was appointed for the Petitioner, and in December 2022, counsel, on behalf of the Petitioner, filed a motion to reopen the post-conviction proceedings pursuant to Tennessee Code Annotated section 40-30-117, as well as a separate petition for DNA analysis. In the motion to reopen, the Petitioner asserted as grounds for reopening that new scientific evidence existed establishing that he was actually innocent of the offenses. *See* Tenn. Code Ann. § 40-30-117(a)(2). The Petitioner referenced the following as issues supporting relief: inconsistent testimony regarding how the spent shotgun shell was found in the Petitioner's yard, as well testimony about the brands of the spent shotgun shells; chain of custody of the spent shotgun shell found at his residence; and the existence of alibi witnesses. According to the Petitioner, "a suggestion now exists that a dog of some kind actually found the fortuitous shell, or at least played some role in that[,]" and this was not considered by the trial court in rendering its ruling declining to suppress the spent shotgun shell. The Petitioner argued that "[t]he separate request for DNA analysis is pertinent to answering the question as to how the shell got there in the first place." Finally, the Petitioner noted that "latent DNA evidence" on the spent shotgun shell "would lend support that someone else other than [the] Petitioner, deposited the spent shell casing at the residence." The Petitioner surmised that, outside of the codefendant's self-serving testimony, "the fortuitous shell, the evidence most central to implicating independently[] the Petitioner's guilt before a jury of his peers, should have been suppressed." In conclusion, the Petitioner prayed, "[T]he totality of all of the circumstances herein suggest that Petitioner is factually innocent, and/or that he has been substantially denied a fundamental constitutional right of such magnitude, so as to support setting aside the judgment."[2]

As noted, the Petitioner filed a separate petition requesting DNA analysis of the spent shotgun shells under either Tennessee Code Annotated section 40-30-304 or section 40-30-305, making similar arguments to those raised in the motion to reopen. After making many of the same statements cited above, the Petitioner, in conclusion, requested touch DNA analysis of the shotgun shells, asserting,

> DNA analysis of the shotgun shell found at the [Petitioner's] residence, would provide proof as to who, or what, touched the shell . . . found at that location. Further, shells at the scene, if tested, might reveal who else might

---

[2] The Petitioner never separately raised a claim for reopening based upon a final ruling of an appellate court establishing a constitutional right that was not recognized as existing at the time of trial, which required retroactive application. *See* Tenn. Code Ann. § 40-30-117(a)(1).

have touched the shell casings or even tampered with them. DNA touch evidence of the [codefendant] would stand to exonerate the Petitioner.

Presumably, in response to the State's assertion that the shells were no longer in existence, the Petitioner observed that "[t]he State was on notice as early as 2003, that the shells and DNA upon same, were at issue" and that the "Petitioner requested previously, and now again requests, testing of the shotgun shell casings for touch DNA evidence." The Petitioner contended that "[a]ny destruction of the evidence would prejudice the ability of the Petitioner to show his actual innocence, and Petitioner submits, would entitle him to a new trial."

The current post-conviction court held a hearing on January 12, 2023. Alisa Simmons testified that she was elected Lincoln County Circuit Court Clerk in 2014 and that one of her responsibilities was to keep evidence that had been admitted in criminal trials until that evidence could be destroyed. Ms. Simmons stated that her predecessor had been in that role for twenty-eight years and that her predecessor was in charge of retention of evidence during the pendency of the Petitioner's trial and any post-conviction proceedings prior to 2014. Ms. Simmons' normal practice was to retain the physical evidence if possible. She had no specific recollection of the Petitioner's previous filings.

Ms. Simmons confirmed that she was unable to find any of the spent shotgun shells in the Petitioner's case, and she believed the shells were destroyed. She explained that evidence had been stored in a room behind "a locked wooden door with a cage door inside" that was also locked. The room was "packed full" of evidence, and the shotgun shells were likely in that room. Because the room had water accessibility, the Sheriff had once built a shower there for housing a murder defendant during trial. Ms. Simmons testified that the room was small with no ventilation and that the evidence in that room had molded after the installation of the shower. Due to the mold and mildew, the evidence in that room was destroyed. Ms. Simmons indicated that at the time the shells were destroyed, she believed that the Petitioner's case had been fully adjudicated and that there were no filings pending.

Both Investigator Boeringer and Sgt. Berry again gave testimony regarding discovery of the spent shotgun shell found at the Petitioner's residence and the chain of custody. Sgt. Berry described the events leading up to his discovery of the shell in the Petitioner's front yard. Sgt. Berry indicated that he picked up the shotgun shell with his bare hand before turning it over to Investigator Boeringer once inside the patrol vehicle. Sgt. Berry was "not familiar with a shell that a dog had found." He did not recall any dog being involved in this case, and there was no mention of any dog in the property receipt releasing the shotgun shell to Investigator Boeringer.

When asked about latent fingerprints[3] left on evidence, Sgt. Berry explained that such evidence "is very fragile" because it "can be wiped away, it can be burned away, [or] it can disappear over time." Relative to fingerprints on firearms and ammunition, Sgt. Berry explained that a latent fingerprint is composed of ninety-eight percent water and two percent fat, so when a bullet is fired, "the very high temperatures that happen when the shell explodes" tend to destroy latent fingerprints on the shell casing. When asked about touch DNA, Sgt. Berry noted that it became prolific in "the mid or late" 2000s after being discovered by an Australian scientist in 1997. Sgt. Berry stated that in his twenty-five years of experience, he had never had any success finding either latent fingerprints or touch DNA on a fired shotgun shell. He further explained that after a significant amount of time had passed, it was likely that any such evidence would have been wiped away or "absorbed into something" due to its having been handled several times.

Investigator Boeringer testified that two officers, including Agent Pence, were at the scene of the murder before he arrived and that he went to the scene on Carpenter Hollow Road to assist. He explained that Agent Pence collected the shotgun shells at the scene and that, although he photographed the shells, he never physically handled them. Investigator Boeringer confirmed that he misspoke at the suppression hearing about the number of each brand of shells when he stated that there were two Winchester brand and four Estate brand, as there were three of each. At trial, he testified to the correct number of each.

Regarding the spent shotgun shell found at the Petitioner's residence, Investigator Boeringer confirmed that Sgt. Berry gave him the shell once they were inside the patrol vehicle and that he signed a receipt from Sgt. Berry transferring possession of the shell to him. Investigator Boeringer recalled that he gave the shell to Agent Pence early the following morning, and he believed that he kept the shell in his possession overnight; otherwise, at that time, there being no deposit box, he would have had to call "the Sheriff or chief deputy to open the evidence room." He agreed that, when Agent Pence filled out the TBI receipt release form, she incorrectly noted the year as 1999.

Investigator Boeringer did not recall any of the spent shotgun shells ever being tested for fingerprints. He opined that, if the shells were tested for fingerprints today, he would be surprised to find any due to the passage of time.

Investigator Boeringer confirmed that the lawyers mentioned something about a dog at the Petitioner's first post-conviction relief hearing. However, Investigator Boeringer

---

[3] Though Sgt. Berry provided testimony on fingerprint analysis, the Petitioner never, at any time, specifically requested fingerprint analysis of the spent shotgun shells.

was clear that no dog was ever involved in this case and avowed that a dog did not find the shell in the Petitioner's front yard. Investigator Boeringer could not recall if a dog was present in the yard when the shell was found, though he recalled that a dog was sometimes tied up in the yard around that time.

Investigator Boeringer also discussed the Petitioner's police interview that took place in Alabama. According to Investigator Boeringer, the Petitioner invoked his *Miranda*[4] rights towards the end of the interview, so the interview was terminated. Investigator Boeringer recalled, "[A]s I went out the door and the door closed, it is on video, I did not catch it in my ear, but he said it was self-defense." Investigator Boeringer believed the interview was recorded, but he could not "say 100 percent it was." When Investigator Boeringer was shown the State's August 1999 discovery response, he agreed that the response reflected that the Petitioner gave an oral statement, rather than a recorded one.

After Investigator Boeringer mentioned the possible existence of a video recording, Sgt. Berry was recalled and testified that he could not recall if recording equipment was installed in the Madison County Sheriff's Department interview room at the time of the Petitioner's interview. When asked if there was a monitor available for other people to watch the interview, Sgt. Berry replied, "Could have been just closed circuit TV for the other investigators [to] watch the interview." Sgt. Berry had never seen any recording of the Petitioner's interview.

Current post-conviction counsel observed that this was his first time hearing about the possibility of any recording of the Petitioner's interview. Post-conviction counsel averred that the existence of a recording could provide the Petitioner with exculpatory information, given that the Petitioner's statement made during the interview was used against him at trial. Post-conviction counsel agreed that there was inconclusive testimony about whether a recording existed.

The Petitioner then testified. He stated he had concerns about (1) Investigator Boeringer's mistaken testimony at the suppression hearing about the number of each brand of shells; (2) the chain of custody of the shell found in his yard, and the incorrect date on the TBI's receipt release form; (3) the nature of his statement regarding self-defense and whether a recording of the interview existed; (4) touch DNA analysis of the shell for Summers' DNA or canine DNA, given the lawyers' statements at his first post-conviction hearing about the presence of a dog; and (5) alleged discrepancies in statements from

---

[4] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

Summers and his family. The Petitioner confirmed that he wanted his conviction set aside and a new trial granted.

In its single order denying relief, the post-conviction court denied the Petitioner's motion to reopen the post-conviction proceedings and his petition requesting DNA analysis of the spent shotgun shells. The Petitioner filed a notice of appeal challenging this ruling. The case is now before us for our review.

## II.     ANALYSIS

### A.     Motion to Reopen

The Petitioner submits that the post-conviction court erred in denying his motion to reopen his prior post-conviction petition. Specifically, the Petitioner argues that there is new scientific evidence establishing his actual innocence and that certain facts underlying his claim, if true, would show by clear and convincing evidence that he is entitled to have his conviction set aside. *See* Tenn. Code Ann. § 40-30-117(a)(1), (4). He complains that "multiple inconsistencies in the tr[ia]l testimony rise to the level of a constitutional deprivation of a fair trial," referencing testimony regarding the brands of the various shells found at the murder scene and the chain of custody of the shells. He also bemoans a denial of due process because "his issues have not been raised squarely and considered[,]" referencing "the prospect of canine involvement . . . apparently missed the attention of everyone thereafter until a review of the record occurred most recently"[5] and "the potential existence of a recording related to Petitioner's purported confession[] was not even contemplated as an issue." The State responds that the post-conviction court did not abuse its discretion by denying the Petitioner's motion to reopen because he neither offered scientific evidence establishing his innocence nor alleged any other ground upon which a motion to reopen might be granted. In the end, we agree with the State.

A motion to reopen post-conviction proceedings is only cognizable if the motion asserts one of the following narrow claims for relief: (1) the claim is based upon a final ruling of an appellate court establishing a constitutional right that was not recognized as

---

[5] Though the Petitioner has consistently argued that possible canine involvement is newly discovered information, we note that the issue was discussed as early as the pretrial suppression hearing. At the suppression hearing, the Petitioner's father was asked if a dog could have carried the spent shotgun shell into his yard. The Petitioner's father responded that it was possible given that there was no fence around the yard, but he said that such was unlikely because he "had a couple of dogs," which stopped "[m]ost people" from entering. The Petitioner's father affirmatively stated his belief that the spent shotgun shell found in the front yard belonged to the Petitioner, explaining, "[The Petitioner] would be the one out there shooting, and he is the one that had those kind of shells."

existing at the time of trial; (2) the claim is based upon new scientific evidence that establishes the petitioner is actually innocent; or (3) the claim is based upon a sentence that was enhanced due to a previous conviction which was later found to be invalid. Tenn. Code Ann. § 40-30-117(a); *see Keen v. State*, 398 S.W.3d 594, 607 (Tenn. 2012). Additionally, the motion must assert facts underlying the claim which, "if true, would establish by clear and convincing evidence that the petitioner is entitled to have the conviction set aside or the sentence reduced." Tenn. Code Ann. § 40-30-117(a)(4). Taking the petitioner's factual allegations as true, the post-conviction court shall deny the motion if it fails to meet the requirements listed in subsection (a). *Id.* § -117(b). If the post-conviction court grants the motion to reopen, "the procedure, relief and appellate provisions" of the Post-Conviction Procedure Act apply. *Id.* On appeal from a denial of a motion to reopen, this court shall not grant the application unless it appears that the post-conviction court abused its discretion in denying the motion. *Id.* § -117(c).

A post-conviction court's denial of a motion to reopen a post-conviction petition does not afford a petitioner an appeal as of right pursuant to Tennessee Rule of Appellate Procedure 3(b), but rather, such denial may be challenged on appeal only by the filing of an application for permission to appeal in this court no later than thirty days after the denial by the post-conviction court. *See* Tenn. Code Ann. § 40-30-117(c); Tenn. Sup. Ct. R. 28, § 10(B). "The application shall be accompanied by copies of all the documents filed by both parties in the trial court and the order denying the motion." Tenn. Code Ann. § 40-30-117(c); *see* Tenn. Sup. Ct. R. 28, § 10(B). Thus, Tennessee Code Annotated section 40-30-117(c) outlines four requirements for an appeal from a motion to reopen to be considered: (1) the timeliness of filing, (2) the place of filing, (3) the application to be filed, and (4) the attachments to the application. *Graham v. State*, 90 S.W.3d 687, 689 (Tenn. 2002).

"In general, the contents of an application for appeal must include the date and judgment from which the petitioner seeks review, the issue which the petitioner seeks to raise, and the reasons why the appellate court should grant review." *Id.* at 691. Whether a pleading entitled "notice of appeal" satisfies the requirements of an application for permission to appeal is a matter of substance over form. *Id.* ("[T]he label [on the pleading] is not dispositive of whether this [c]ourt may nonetheless treat the filing as an application for permission to appeal."). That being said, we may not suspend the statutory requirements. *Roberson v. State*, No. W2007-00230-CCA-R3-PC, 2007 WL 3286681, at *9 (Tenn. Crim. App. Nov. 7, 2007). The failure of a petitioner to comply with the statutory requirements governing review of a denial of a motion to reopen deprives this court of jurisdiction to entertain such matter. *Id.*

Here, the Petitioner filed a Rule 3 notice of appeal with this court on May 30, 2023. The Petitioner stated therein that he was appealing the post-conviction court's May 2, 2023 order denying his "Petition/Motion to reopen his prior application for Post-Conviction Relief." While the notice in this case was timely and provided the entry date and judgment from which the Petitioner sought review, we cannot say that it "contained sufficient substance that it may be effectively treated as an application for permission to appeal." *Graham*, 90 S.W.3d at 691. It failed to state the issues for review and failed to explain why this court should grant review. *See id.* In addition, the notice was not accompanied by the required documents. *See* Tenn. Code Ann. § 40-30-117(c). Consequently, the notice of appeal in this case fails to satisfy the requirements for an application for permission to appeal, and we lack jurisdiction to consider this aspect of the appeal. *See, e.g.*, *Simmons v. Lee*, No. M2018-00150-CCA-R3-PC, 2018 WL 4771122, at *3 (Tenn. Crim. App. Oct. 2, 2018).

## B.     DNA Petition

The Petitioner argues that the post-conviction court erred by denying his petition for touch DNA analysis of the shotgun shells found at the Petitioner's residence and at the scene of the murder. The Petitioner requests DNA testing of the shotgun shells for the possible presence of either canine DNA or his codefendant's DNA, contending that such analysis was pertinent to answer the question of who or what might have touched the shells. The State responds that the post-conviction court properly denied the Petitioner's request for DNA analysis because the shotgun shells no longer exist. We agree with the State.

The Post-Conviction DNA Analysis Act of 2001 ("DNA Act") provides that a petitioner convicted of specific offenses, including first degree murder, "may at any time, file a petition requesting the forensic DNA analysis of any evidence that is in the possession or control of the prosecution, law enforcement, laboratory, or court, and that is related to the investigation or prosecution that resulted in the judgment of conviction and that may contain biological evidence." Tenn. Code Ann. § 40-30-303. Tennessee Code Annotated section 40-30-304 requires that once the State has been provided notice and an opportunity to respond, the court *shall* order DNA analysis if it finds that:

> (1) A reasonable probability exists that the petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through DNA analysis;

> (2) The evidence is still in existence and in such a condition that DNA analysis may be conducted;

- 12 -

(3) The evidence was never previously subjected to DNA analysis or was not subjected to the analysis that is now requested which could resolve an issue not resolved by previous analysis; and

(4) The application for analysis is made for the purpose of demonstrating innocence and not to unreasonably delay the execution of sentence or administration of justice.

In addition, the court *may* order DNA analysis if it finds "[a] reasonable probability exists that analysis of the evidence will produce DNA results that would have rendered the petitioner's verdict or sentence more favorable if the results had been available at the proceeding leading to the judgment of conviction[,]" and the petitioner has satisfied requirements (2), (3), and (4) listed above. *Id.* § -305.

Under both the mandatory and discretionary provisions, a petitioner must satisfy all of the statutory requirements before DNA analysis will be ordered by the court. *Powers v. State*, 343 S.W.3d 36, 48 (Tenn. 2011). Failure to meet any of the four criteria is fatal to the action. *Buford v. State*, No. M2002-02180-CCA-R3-PC, 2003 WL 1937110, at *6 (Tenn. Crim. App. Apr. 24, 2003). In addition, the post-conviction court is not required to hold a hearing to determine whether a petition for DNA analysis should be granted or denied. *Powers*, 343 S.W.3d at 56; *see also* Tenn. Code Ann. § 40-30-312 (mandating a hearing only after DNA evidence produces a result favorable to a petitioner). The post-conviction court's determination of whether to grant a petition for DNA analysis is reviewed for abuse of discretion. *See Elsea v. State*, No. E2017-01676-CCA-R3-PC, 2018 WL 2363589, at *3 (Tenn. Crim. App. May 24, 2018).

On appeal, the Petitioner acknowledges that the spent shotgun shells were destroyed and are no longer in existence for testing. In an attempt to counter their absence, the Petitioner cites Tennessee Code Annotated section 40-30-309, which requires a post-conviction court, if the petition for DNA analysis is not summarily dismissed, to order "that all evidence in the possession of the prosecution, law enforcement, laboratory, or the court that could be subjected to DNA analysis must be preserved during the pendency of the proceeding." He notes that the evidence was not preserved in compliance with this statute when the Petitioner first sought DNA testing in 2003. The Petitioner also asserts that, given he is serving a life sentence, "the evidence should have been preserved indefinitely, not stored in the dank closet."

- 13 -

At this juncture, we feel constrained to note that the post-conviction court certainly would have been operating within the confines of the law by summarily dismissing the Petitioner's filings in this case without an evidentiary hearing. For the sake of judicial economy, the better practice might have been to do so here, given that the shells were no longer in existence and the resources consumed by the lengthy evidentiary hearing that took place. The State, in its response to the Petitioner's DNA petition, specifically outlined the steps it had taken to locate the spent shotgun shells in the Petitioner's case, which had proven to be unsuccessful. The Petitioner did not respond to this allegation in his amended petition for DNA analysis other than to assert that the State had a responsibility to maintain the evidence since 2003, when the Petitioner filed his first petition for DNA analysis. The post-conviction court had a sufficient basis from which it could have concluded that the Petitioner failed to prove the evidence was still in existence, which would have supported summary dismissal. *See, e.g.*, *State v. Wilks*, No. W2014-02304-CCA-R3-PC, 2015 WL 5719926, at *4 (Tenn. Crim. App. Sept. 30, 2015); *Phelps v. State*, E2005-02405-CCA-R3-PC, 2006 WL 2328661, at *3 (Tenn. Crim. App. Aug. 11, 2006). The DNA Act does not specifically provide for a hearing as to the qualifying criteria and, in fact, authorizes a hearing only after DNA analysis produces a favorable result. *Brock v. State*, No. E2022-00082-CCA-R3-PC, 2022 WL 3592610, at *2 (Tenn. Crim. App. Aug. 23, 2022) (citing Tenn. Code Ann. § 40-30-312), *perm. app. denied* (Tenn. Dec. 14, 2022).

Nonetheless, the post-conviction court afforded the Petitioner an evidentiary hearing on his DNA petition regarding the qualifying criteria where the Petitioner was able to present evidence and cross-examine witnesses. At this hearing, Ms. Simmons testified that she was unable to locate the shotgun shells after searching the Petitioner's file and that the shotgun shells were likely destroyed after the Sheriff installed a shower in a portion of the evidence room to house a prisoner during his murder trial. She explained that all of the evidence in that area had molded because of the shower and lack of ventilation and that the area was later cleaned out and the evidence destroyed. Ms. Simmons believed that the Petitioner's actions had been fully adjudicated at that time. The post-conviction court accredited Ms. Simmons' testimony and concluded that there was "no other evidence to support [the shotgun shells'] existence." We cannot say that the post-conviction court abused its discretion in this regard.

Relative to the Petitioner's allegation that the State was required to preserve the shotgun shells since he filed his pro se petition for DNA analysis in 2003, we note that the Petitioner appended his first petition for DNA analysis to his April 29, 2003 petition for post-conviction relief. In that petition, the Petitioner made a generic request for testing of "all human biological evidence in the possession or control of the prosecution, law enforcement, laboratory, or court which relate[d] to the investigation and prosecution" in

- 14 -

this case. He did not identify any particular evidence to be tested or the favorable result he sought from such testing. Moreover, the Petitioner had separately filed another pro se petition for post-conviction relief in 2003, and an amended petition was filed after counsel was appointed. *Pepper*, 2004 WL 2853429, at *1. The Petitioner has not included any of these prior petitions besides the April 2003 pleading in the record on appeal. Nor has he included the original post-conviction court's order denying relief. Thus, it is unclear from the record whether the Petitioner actually pursued any previous request for DNA analysis.

The post-conviction court observed that any discussion regarding DNA analysis was absent from the order denying the Petitioner's 2003 post-conviction petitions, as well as in this court's opinion on direct appeal of that denial. The post-conviction court found that the Petitioner abandoned, or at the very least failed to prosecute, his 2003 request for DNA analysis. The record does not belie the post-conviction court's determination in this regard.

Furthermore, while Tennessee Code Annotated section 40-30-309 provides for sanctions, including criminal contempt for a "knowing" violation of an order to preserve evidence, this provision applies only when the post-conviction court has found that the petition should not be summarily dismissed and orders that all evidence in possession of the State be subjected to DNA analysis. *Johnson v. State*, No. M2002-03033-CCA-R3-PC, 2004 WL 101629, at *2 (Tenn. Crim. App. Jan. 16, 2004). This section does not apply to the inadvertent destruction of evidence while no action is pending in a particular case. As this court has previously observed, "[i]t places an unreasonable burden on the State to forever preserve each article of evidence collected in every investigation on the chance that it may later be called upon for further analysis." *Ali v. State*, No. M2005-01137-CCA-R3-PC, 2006 WL 1626652, at *3 (Tenn. Crim. App. June 2, 2006).

The DNA Act states that one of the prerequisites to a post-conviction court's ordering DNA analysis is that the evidence requested for testing still exist. Because the proof at the hearing reflected that the spent shotgun shells were no longer available for testing, the post-conviction court did not abuse its discretion by dismissing the petition on the basis that the Petitioner could not satisfy the statutory requirements for DNA analysis. *See, e.g.*, *Nunley v. State*, No. W2014-01776-CCA-R3-PC, 2015 WL 1650233, at *3 (Tenn. Crim. App. Apr. 13, 2015); *Thompson v. State*, No. E2003-01089-CCA-R3-PC, 2004 WL 911279, at *3 (Tenn. Crim. App. Apr. 29, 2004). He is not entitled to relief.

### C.    Plain Error

The Petitioner also makes a stand-alone argument that "given the complaints raised by [him], and the unavailability of the evidence, [p]lain [e]rror exists under these

- 15 -

circumstances." In this regard, the Petitioner focuses on whether a video recording existed of his police interview that was never disclosed in discovery, maintaining that Investigator Boeringer testified at the post-conviction hearing that he did not actually hear the alleged confession, but rather that it was captured on video. According to the Petitioner, "the omission of the recording would constitute a *Brady*[6] violation[,]" and the potential existence of this recording was not discovered until the post-conviction hearing. He also contends that "[t]he crime evidence was . . . destroyed." He surmises that "these issues affected the outcome of his initial trial and now denied him access to exculpatory evidence." The State responds that plain error relief is not cognizable under any provision of the Post-Conviction Procedure Act. We agree that the Petitioner is not entitled to relief on this claim.

The Code's limitation of post-conviction relief to "claims for relief [that] have not been waived or previously determined," Tennessee Code Annotated section 40-30-106(f), shields issues raised for the first time on appeal from plain error review, *see State v. West*, 19 S.W.3d 753, 756-57 (Tenn. 2000). "[T]he plain error rule, which would otherwise permit an appellate court to address the issue sua sponte, may not be applied in post-conviction proceedings to grounds that would otherwise be deemed waived or previously determined." *Holland v. State*, 610 S.W.3d 450, 458 (Tenn. 2020) (quoting *Grindstaff v. State*, 297 S.W.3d 208, 219 (Tenn. 2009)) (internal quotation marks omitted). "[I]ssues not addressed in the post-conviction court will generally not be addressed on appeal." *Lane v. State*, 316 S.W.3d 555, 561-62 (Tenn. 2010) (quoting *Walsh v. State*, 166 S.W.3d 641, 645-46 (Tenn. 2005)). "Tennessee appellate courts may only consider issues that were not formally raised in the post-conviction petition if the issue was argued at the post-conviction hearing and decided by the post-conviction court without objection." *Holland*, 610 S.W.3d at 458 (citations omitted).

Here, even if the video-destruction issue was alluded to at the post-conviction hearing, it was never squarely presented for a ruling, so there was no determination from the post-conviction court. Moreover, the issue was not raised in a petition for post-conviction relief. This issue is waived, and plain error review is unavailable to the Petitioner. *See, e.g.*, *Jones v. State*, No. W2020-01743-CCA-R3-PC, 2022 WL 99977, at *5 (Tenn. Crim. App. Jan. 11, 2022).

---

[6] *See Brady v. Maryland*, 373 U.S. 83 (1963).

### III. CONCLUSION

Based on the foregoing and the record as a whole, the judgment of the post-conviction court is affirmed.

s/ Kyle A. Hixson
KYLE A. HIXSON, JUDGE